## STATE OF MAINE *vs.* AMOS C. BENNER.

*Evidence. Practice.*

It is in the discretion of the court to permit the counsel calling a witness to propose to him leading questions, and to cross-examine him, when he is an unwilling witness and adverse to the party by whom he is called.

The occasion for this permission is to be determined by the presiding justice, and the granting of it is not subject to exception.

The limit of cross-examination as to collateral matters, allowable by a judge at *nisi prius,* is matter of discretion.

When a witness, on whose evidence in part an indictment has been found, but who is called by the prisoner, testifies at *nisi prius,* differently from what he had done before the grand jury, a member of that panel is a competent witness to prove what he stated before that body for the purpose of contradicting and impeaching his testimony.

A witness cannot be cross-examined on collateral matters for the purpose of subsequently contradicting and impeaching his testimony in relation to such collateral subjects.

If the irresponsive answer of a witness is objectionable, the objection must be taken at the time, and the court should be requested to have it stricken out.

The statements of a witness, not under oath, are hearsay and receivable only to contradict what he may have said under oath, and to impeach his testimony, and not as evidence of the facts stated.

It is not error to say to the jury that their verdict is not final and irreversible, and that the evidence is to be reported to the governor and council for their consideration and examination, and that after revising the evidence they may order the execution of the sentence, or commute it, or pardon the offender.

When it is perceived that the court has misapprehended testimony, it is the duty of the counsel at the time to call its attention to the subject, that the correction may at once be made.

State *v.* Benner.

It is no ground of complaint that the judge states to the jury the positions of fact as respectively assumed, or claimed to exist, by the counsel on the one side or the other, that they may more distinctly perceive the precise issues presented for their decision. Indeed, it may be his duty so to do.

The utterance of falsehoods by the prisoner, by way of exculpation, the falsehoods being established by satisfactory proof, is universally recognized as circumstantial evidence tending to establish his guilt, the inculpatory force of which is to be determined by the jury.

A hypothetical statement, which pre-supposes as its basis that the issue has already been determined, is not an expression of an opinion "upon issues of fact arising in the case," within the act of 1874, c. 212.

The opinion for the expression of which a new trial is to be granted, must be a distinct and positive one, "upon issues of fact arising in the case."

ON EXCEPTIONS.

INDICTMENT, charging that Benner, in the night time of the eighteenth of September, 1873, set fire to and consumed the dwelling house, owned and then occupied by Charles P. Holland, in Pembroke, in said county. The family then being in the house, this was a capital offence, under our statutes. The respondent was convicted. Numerous exceptions to the rulings at the trial, and to the charge to the jury, were taken. Fully to understand the first two it is necessary to transcribe a large portion of the direct examination of Henry J. Motz, called as a witness by the government. It must first be premised, however, that the respondent's wife left him and took refuge at Holland's, within a week of the fire; and that, when Benner went after her, Mrs. Holland remonstrated against Mrs. Benner returning with Mr. Benner, who became very much excited and enraged, and so conducted himself that a warrant was issued against him and one of two men who accompanied him and they were tried before Mr. Bailey, a trial justice, on the seventeenth day of September, 1873, and the prisoner's comrade (Bela Anthony,) was sentenced to pay a fine, but it was paid by Benner, who immediately signed a complaint against Holland for an illegal sale of intoxicating liquors; but after the warrant against Holland had been put into a constable's hands, and before it was served, Benner came to Mr. Bailey, paid for it and procured its recall, saying : "Perhaps you may want to

know why I wish to withdraw the warrant. I wish to punish him more than this." He inquired what the punishment would be, and on being told a fine of thirty dollars and costs, said, "it will not be enough," and asked "if he could not punish him more by getting him indicted." Being told he might, if he could get Holland convicted as a common seller or for keeping a tippling shop, but that it was doubtful if the facts would sustain either of those charges, he exclaimed: "Damn him, I want to punish him more!" The magistrate expostulated with him, telling him that Holland was a simple sort of a man, of no great information, an innocent fellow, and that he had better let it drop; but Benner said: "By God, I will have revenge for what he has done to me." Finding remonstrance useless, Mr. Bailey said no more, and Mr. Benner (and a man with him whom Bailey did not recognize) left Mr. Bailey's house, distant two or three miles from Holland's, at just fifteen minutes before nine o'clock as that gentleman (Bailey) noticed when he passed through his dining-room after closing the door behind them. Mr. Holland's house was discovered to be on fire between ten and eleven o'clock of that same night. Among the last articles carried out by Mr. Holland was his pendulum clock, which he laid down upon the grass, and it was stopped at five minutes of eleven. The precise moment of Benner's leaving Mr. Bailey's was impressed upon that gentleman's mind when he heard of the fire the next day. Mrs. Holland and a Mrs. Carter who was visiting her at the time of the fire swore to seeing Benner looking into the window of Mr. Holland's house about ten o'clock, just before they retired. Mrs. Carter first saw him and called Mrs. Holland's attention to him. Directly after this Mrs. Holland went up stairs to bed and told her husband that Benner was round the house, to which he replied she was always surmising something. Her last act before going up stairs was to wind the clock, and she noticed it was ten o'clock.

While Mr. Motz, the witness before mentioned, was under examination by the state attorney he was asked if he was at the trial of Benner before Mr. Bailey on the seventeenth of September,

1873, and if he saw the prisoner there.   He replied affirmatively, and that he had a conversation with Benner, because he (witness) always talked with everybody he met.   He was then interrogated as to whether or not the conversation was respecting Holland's wife, and responded that something was said by Benner; that she swore to a lie; should not come upon his premises ; and if she came into his house he would kick her out of doors, "or something like that."   He then testified to meeting the prisoner at a Mr. Anthony's in the evening after the trial, and to the conversation had there, in which Benner told about his going to Holland's after his (Benner's) wife and child, and having borrowed a revolver of Jim Robinson to carry with him there.   The following colloquy then ensued :

*Q.* "Do you remember anything that he said about Mr. Holland, there at Anthony's ?"   *Ans.* "Yes.   He said he thought Charles Holland told the truth as near as he (Benner) could tell it himself.   He said he found no fault with him, and he never paid any money with so good a heart as he paid that fine."

*Q.* "What did he say about Mrs. Holland ?"   *Ans.* "I don't remember what he did say ; but he did not like her so well as he did Charley, I can tell you that."

*Q.* "Did he make any threats against the Hollands ?"   *Ans.* "He made none against Charley Holland.   He said Mrs. Holland should not come into his house."

*Q.* "Did he say anything about their buildings at Anthony's ?" *Ans.* "I don't think he did say anything about his buildings."

*Q.* "Don't you remember anything he said about Mrs. Holland at that place ?" *Ans.* "I don't remember the words, but he didn't like her very well.   It has been so long I can't remember the words."

*Q.* "Tell it as near as you can, Mr. Motz." *Ans.* "About as much as I heard him say was that she swore to a lie, and she should not come to his house again ; if she did, he would kick her out."

*Q.* "Did he say anything about burning ?" *Ans.* "Well"—

[Objection interposed by Mr. McNichol, who said to the court : "Does your honor admit that ?" and the judge replied: "Yes, to this witness. He is an unwilling witness."] The question was then repeated, in the same words. *Ans.* "Well, my memory is so poor I don't want to say anything about it. We talked there a good deal, one way and another. I don't know"—

*Q.* "What did he say, if anything, about burning ? Give the substance." *Ans.* "I think he did not say nothing about burning the house."

*Q.* "Well, about burning Mrs. Holland then ?" [Objection interposed.] *Ans.* "I don't think he said anything about that."

*Q.* "Did he say anything about burning anything connected with the Hollands?" *Ans.* "Well, not really; I don't think he did. He kind o' laughed and said, 'Bela, if they did take $15 out of us, we will live on roast beef the rest of the winter ;' or something like that."

*Q.* "Can you recollect anything that was said about burning ?" *Ans.* "I don't think I can. I don't seem to recollect."

*Q.* "Was nothing said about burning there by him that night?" [Objected to.] *Ans.* "I don't know but he might have said it was no matter if the damned old coop was burned up, but I did not hear him say that he would burn it up. I guess that was about all that was said."

*Q.* [By THE COURT.] "Do you know that he did say that about the old coop ?" *Ans.* "Well, I should say that he did. I guess he did."

*Q.* "Now, what else did he say about the coop, or burning Mrs. Holland ?" *Ans.* "I did not hear him say anything about burning Mrs. Holland."

*Q.* "Did he say, 'damn her, he wished she was burned up ?' " *Ans.* "Well, it was said there, but I don't remember of him saying it. There was something of that kind said there. That comes pretty nigh to it. The prisoner did not say it. The prisoner was present."

*Q.* "Did he say it would be better for her, or the world, if she was burned up ?" *Ans.* "No, sir."

*Q.* "Did he say what he would do if his wife went there again ?"
*Ans.* "He said she should not go there. I don't know as I can tell you what was said. There was a good deal said."

*Q.* "I am only asking what he said upon that point ?" *Ans.* "He said she should not go there again."

*Q.* "Did he say what he would do, if she did ?" [Objection made.] *Ans.* "I want to think—I have nothing against anybody. I think there was something said about burning the damned old coop up, but I don't know who said it. I don't think I heard him say so."

*Q.* "Did he say, 'Susie, if you go there again, I will burn the damned old coop up ?' " [Objection noted.] *Ans.* "Well, I think he did."

The direct examination was pursued till it was drawn out that the witness went straight from the trial at Bailey's to Eben Anthony's, where Bela Anthony and his wife lived, and was there two hours, during which the talk he heard was had ; and that the next morning he went half a mile, to the place where he supposed Holland would be at work, and failing to find him went again in the evening and staid till nine o'clock, but he did not come. The following questions were then put to the witness :

*Q.* "What did you go to see him for ?" *Ans.* "I wanted to have a little talk with him."

*Q.* "For what purpose ?" [Objected to and excluded, unless connected with the case.]

*Q.* "Did you go to see Charles Holland in consequence of what you heard Benner say the night before at Eben Anthony's ?" *Ans.* "Yes, I did."

*Q.* "Did you go to see him in consequence of what you heard the prisoner say about burning ?" [Objected.] *Ans.* "No, sir, I did not hear him say anything but—Did you want me to tell you what I went for ? I went up the next morning, and he was not there ; and I went the next night, the night the house was burned, to tell him that if I was him, I would get my hay and barn insured."

*Q.* "And was that what you went in the morning for ?" *Ans.* "Yes ; and I went at night for that purpose."

To the overruling of their objections to the foregoing interrogatories the respondent's counsel excepted.

From the testimony of John H. Benner, brother to the defendant, and summoned by him, it appeared that it was he who called with the respondent at Mr. Bailey's upon the night of the fire; and he swore that he took Cris. (the defendant) to Pembroke and carried him nearly home ; and that, from his statement, they must have been several miles distant when the fire was set, and that they did not pass Holland's house that night, returning home (as they came) by a shorter road. In the course of his testimony he volunteered a remark as to what it was before the grand jury; and at a later stage of the trial, Charles Cary, foreman of the grand jury which found the indictment, was called to prove that John H. Benner and Bela Anthony made statements before the grand jury very materially different from, and entirely irreconcilable with, those made when testifying for the defence upon the trial. To the admission of the testimony of Mr. Cary, as to what transpired before the grand jury, the defendant's counsel strenuously objected, but it was received.

It came out in evidence that a civil action had been commenced by Charles P. Holland against Amos C. Benner, to recover the value of the property destroyed by this fire. On cross-examination, Holland was asked if he did not tell Mr. Lincoln that he did not direct these proceedings, and that he was going down to stop them. His reply was that he did not say so ; and the defendant while putting in his testimony on his part, called Mr. Lincoln, and proposed to show by him that Holland did say this to Lincoln; but the court excluded it ; saying to counsel that the inquiry was collateral, and the answer obtained binding.

Emilus W. Carter, a neighbor of Holland's, called in defence, testified to being at the fire till the house burned down. He was asked if anything was said there that night about seeing Benner there ; but the state attorney objecting, he was not permitted to

answer. He was then asked if he heard anything said about seeing anybody there ; and no objection being interposed, replied that he did not. The defence excepted to the exclusion of the former question.

Jacob R. Sinclair, called in rebuttal by the government, testified to fishing at a designated bridge on the night of September 18, 1873, with other persons, so that he could have seen Benner had he passed that way, as claimed by him and his brother John. One of the two persons who were with Mr. Sinclair testified to seeing and talking with Benner upon that bridge about ten o'clock that night, but Mr. Sinclair and his other comrade denied it. The defence, to show Sinclair might have been mistaken as to the night, asked him if he did not go to his home, some distance off, after the mill in which he worked was closed in August, and he said that he went home on Saturdays and returned to work in the mill on Monday. The question was then put : "Didn't you come back and go into that mill Tuesday ?" *Ans.* "If they sent word for me to come I did."

*Q.* "You didn't come till they sent for you ?" *Ans.* "If I was fishing"—Here the court interposed with the remark that it was no matter where he was at any other time if he was there on the night of the eighteenth of September; to which exclusion and remark the defendant excepted.

Exceptions were also taken to the following passages of the charge to the jury : "Now, gentlemen, it is contended here that if the prisoner is convicted he goes to the gallows. Well, it is only one step in that direction, and that step may be retraced. It does not follow that he will be hung if your verdict should be against him, therefore your responsibility is not so great as contended. Other tribunals have responsibilities. The court, yourselves, and the chief executive of the state, all share the responsibilities ; because if your verdict should be guilty, this may come before the court, and the whole of the evidence be reviewed, and if they are satisfied your verdict is wrong they will set it aside. But if not so satisfied, then the sentence prescribed by law is pro-

nounced, and that is that he shall be hung. But the responsibility does not stop there. The whole of the evidence, according to the law of Maine, has to be reported to the governor and council. Every particle of the evidence must be reported and examined, and if the governor is satisfied that the verdict is not right, or not clearly right, he is authorized—and the statute says after the person has been imprisoned for one year—that he shall, after revising the evidence, then either pardon, or commute, or execute the sentence. One of these three things it is his imperative duty to do. He may pardon, if he thinks the testimony not sufficient to warrant a verdict; or may commute to imprisonment for life; or issue his warrant for execution, as prescribed for this offence. Now, gentlemen, we know, notwithstanding that imperative declaration of the statute, that statute has been disregarded for a series of years. Why it has been so, it is not for me to say. There are a number of individuals in the state prison, who have been there for years, under the sentence of death, and there has been no pardon, no commutation, and no execution. . . . . So, gentlemen, you see you are only one of the co-ordinate tribunals, sitting in the administration of justice. Now, gentlemen, these remarks are general, and have no particular application to this case, only to show that your jurisdiction is in aid of the other tribunals of the state, and that if you make a mistake it can be remedied; and that the individual, if convicted, does not go directly to the gallows; it is a step in that direction which may be retraced."........................................................

"It seems that on the evening of the eighteenth of September last he (the prisoner) was seen at Mr. Bailey's, the magistrate's, and you recollect the circumstances why he was there. Now, at the time he started from that place, Mr. Bailey says it was fifteen minutes before nine in the evening. Where did he go? Did he take the route passing by Holland's and fire the house, and then go in a direct course home, or did he take another route? Now, the theory of the government is, and they have introduced testimony tending to show it, that he took the route passing by Hol-

land's house, fired the building, and arrived home after the building was in flames. On the other hand, it is contended in the defence, that he took another route, which did not pass that house, and was seen at various places, at particular times, and arrived home about ten o'clock, before the house was seen to be on fire. There is the question ; and after all, it depends principally upon the question of time. If he arrived home at ten o'clock, and before this house was consumed, or in flames, of course it is not contended that he can be the guilty party. On the other hand, if he has falsified, and it follows from the testimony that he arrived home long after the house was consumed, it is a circumstance and strong evidence of his guilt, because it is a fact that if a man undertakes to prove that he was in a different place, and the testimony shows to the contrary, it is a circumstance, though not conclusive of his guilt. Then, gentlemen, consider the testimony in relation to those two theories, that on the part of the government and on the part of the defence. Look at all of the testimony, and scrutinize it carefully. It is conflicting. Witnesses upon the stand make certain statements, and other witnesses are called to swear that they made other statements at other times, which goes to discredit their statements. The prisoner and his brother John are introduced. If the prisoner is guilty, you must come to the conclusion that his brother John was a confederate. You see, therefore, how they are situated, and the motive to falsify, if he is guilty. The prisoner is a competent witness, made so by the law; still, the force and effect of his testimony is wholly for your consideration. You may disregard it entirely, or you may give it full weight. It is altogether a subject for your own consideration.

Then, gentlemen, there is another question, and that is whether the fire was accidental. If it was an accident, why then the prisoner could not have set it. . . . . . Then, it is contended that there were two individuals who saw Benner there before the fire on this evening, and you have heard the testimony and the arguments in relation to that. If you believe that he was there, then perhaps you would not hesitate to believe that he was the perpe-

trator of this crime. Then, it is said that he made threats to burn the building. When he was at Bailey's, he swore, by God, that he would have revenge, on the same night that the building was burned, and it is contended that he carried the threat into execution. You have heard the testimony and the arguments, and judge you whether that threat was executed or not. The defence then introduced the prisoner's good character. You have heard that, and there was no controversy about it," &c., &c. . . . . . .

*Joseph Granger* and *A. McNichol* for the respondent.

The counsel argued in support of their exceptions to the leading questions asked Motz by the state attorney, and the inquiry as to the purpose for which that witness tried to find Holland; to the introduction of Cary's testimony as to what was stated before the grand jury, citing 1 Greenl. on Ev., § 252; Roscoe's Crim. Ev., 150; 2 Starkie on Ev., 232; Bishop's Crim. Proc., § 738; *McLellan* v. *Richardson*, 13 Maine, 82, and *State* v. *Knight*, 43 Maine, 11 and 128; to the exclusion of Lincoln's statement of what Holland told him about seeing Benner, and of Hobart and Gardner's testimony as to what Holland said about suspecting anybody of being the incendiary—(which the judge excluded with the remark, "That is not material");—and of Carter's statement whether or not anything was said at Holland's at or after the fire (on that night) about seeing Benner there; to the exclusion of and comment upon question proposed to Sinclair; to so much of the charge as tended to diminish the juror's sense of responsibility; to the reference to the statement of the time, as fixed by Bailey; to the assumption by the court that the government had a theory which the testimony tended to prove; to the statement that, after all, it was principally a question of time; (as it was claimed these last two matters were questions of fact to be submitted to the jury without comment, under the act of 1874, c. 212); to the instruction as to the effect of its being satisfactorily proved that Benner lied about his whereabouts and the time of his arrival home; to that saying that if the prisoner was guilty, his brother John must have been his confederate, &c.; to that

stating that a belief that Benner was seen at Holland's that night. might lead to a conclusion of his guilt; and to the assumption, as an undisputed fact, that the prisoner did say at Bailey's that by God, he would have revenge, &c.

*H. M. Plaisted,* attorney general, for the state.

The attorney general argued ably and elaborately in support of the rulings and instructions of the court; citing in support of his method of examining the government witness, Motz ; 1 Starkie on Ev., 132 ; 1 Philips on Ev., 205; 2 Graham & Waterman on New Trials, 694; *Stratford* v. *Sanford,* 9 Conn., 275.

As to the right to introduce Cary's testimony as to the evidence before the grand jury he cited; *Commonwealth* v. *Hill,* 11 Cush., 137; *Commonwealth* v. *Mead,* 12 Gray, 167, and cases there cited ; *Burnham* v. *Hatfield,* 5 Blackf., (Ind.,) 21; *State* v. *Broughton,* 7 Iredell, (No. Car.,) 96 ; *Sands* v. *Robinson,* 12 Smedes & Marshall, (Miss.,) 704; Low's case, 4 Maine, 440; 1 Bishop's Crim. Proc., § 859, 729 ; 1 Archbold's Crim. Prac. & Plead., 488, and note.

To the propriety of the exclusion of testimony to contradict upon collateral matters, elicited by cross-examination; *Ware* v. *Ware,* 8 Maine, 42 ; *Page* v. *Homans,* 14 Maine, 478; *People* v. *McGinnis,* 1 Parker's Crim. Rep. 387; *Seavey* v. *Washburn,* 19 N. H., 351; *State* v. *Theban,* 30 Vt., 100.

The respondent was not injured by the exclusion of the question put to Carter about Benner being seen at Holland's upon the night of the fire, since it was embraced in the next question asked and answered without objection. *Fogg* v. *Babcock,* 41 Maine, 347 ; *Pope* v. *Machias Water Power Co.,* 52 Maine, 535.

The remarks of the judge in his charge, as to the divided responsibility of the jury were of same purport as those of Judge Bigelow, in the Hersey trial, and of Judge Walton in the Lowell case, and no stronger in expression.

APPLETON, C. J. Numerous exceptions have been alleged to the rulings and instructions of the justice presiding at the trial of

the respondent. Those exceptions we propose to consider and discuss in the order of their presentation.

I. Henry J. Motz was called as a witness by the state. The objection is taken that he was cross-examined by the attorney general, and that leading questions were proposed to him.

The answers of a witness, honest and favorable to the party calling him, will obviously depend on the questions proposed. But the party calling will only propose those favorable to his interests. His interrogation will naturally be one sided and the answers partial and incomplete—the inevitable result of incomplete and partial inquiry. Interrogation *ex adverso*, then, is indispensable—that thereby the errors of indistinctness, incompleteness, or incorrectness may be removed and the material facts developed fully, distinctly and correctly.

The witness called, being favorable to the party calling him and dishonest, the necessity of interrogation as a means of extracting the truth is at once perceived, and its value indefinitely increased. Is the witness indistinct, the needed inquiries remove all indistinctness. Is he incomplete, interrogation is the natural and obvious mode of obtaining the desired fullness and completeness. Is he incorrect, inquiry is the only way of detecting and rectifying incorrectness. Important as is the whole truth to correct decision, its attainment will be endangered unless the right of interrogation and cross-interrogation be conceded to the parties litigant to enable them to elicit such facts as from inadvertence, want of memory, inattention, sinister bias, or intentional mendacity may have been omitted.

But it may happen that the witness may be adverse in sympathy and interest to the party by whom he is called. Cross-examination of an opponent's witness is allowable. Why? Because, being called by him, it has been imagined that there was some tie of sympathy or interest, which would induce partiality on the part of the witness in favor of the party, who called him. If the witness is from any cause adverse to the party calling him, the same reasoning which authorizes and sanctions cross-examination, more or less rig-

orous, equally requires it when the party finds that the witness, whom the necessities of his case has compelled him to call, is adverse in feeling, is reluctant to disclose what he knows, is evasive or false. Important as interrogation may be, if the witness is friendly, to remove uncertainty and indistinctness, and to give fullness and clearness, doubly important is it, if the witness be dishonest and adverse, to extract from reluctant lips, facts concealed from sympathy, secreted from interest, or withheld from dishonesty. Cross-examination may be as necessary to elicit the 'truth from one's own, as from one's opponent's witness. When the necessity exists, equal latitude should be allowed in the one case as in the other. The occasion for the exercise of this right must be determined by the justice presiding. It can be by no one else. Its allowance is a matter of discretion, and not the subject of exception.

The presiding justice, finding Motz to be an unwilling witness for the state, allowed leading questions to be proposed; and permitted him to be cross-examined by the counsel calling him. This was in manifest furtherance of justice and in entire accordance with judicial decisions. *Moody* v. *Rowell*, 17 Pick., 490 ; *York* v. *Pease*, 2 Gray, 282 ; *Green* v. *Gould*, 3 Allen, 465.

II. Where a witness, called by a party, appears adverse in interest to the party calling him, the presiding justice may, in his discretion, permit the party so calling him to ask leading questions. This permission· is discretionary on his part, and not subject to exception. The presiding judge seeing and hearing the witness, and observing his manner, is best able to determine whether he is hostile to the party calling him. In the present case, the presiding justice did determine that Motz was an unwilling witness, and one to whom leading questions might properly be proposed and his conclusion is not open to revision.

The answers of Motz being objected to, it may not be amiss to note what preceded the remark of the witness which is alleged as a ground for setting aside the verdict. The witness stated without objection that he went to see Holland and have a little talk

with him. He was then asked : "For what purpose," he wanted to have a talk with him ? This was objected to, and the objection sustained, "unless connected with the case." The witness was then permitted to say that he saw Holland in consequence of what he heard the night before. But this was harmless and immaterial. The court admitted these immaterial inquiries to ascertain if the former question had "any connection with the case," that being the purpose for which they were proposed. The witness had said previously that he thought the prisoner had said he would "burn the damned old coop up."

The witness was then asked: "Did you go to see him in consequence of what you heard the prisoner say about burning ?" To this question an objection was noted. The answer was: "No, sir: I did not hear him say anything." This constituted a full and complete answer to the question and furnishes no ground whatever of complaint.

The witness then, of his own motion, says: "But did you want me to tell you what I went for? I went up the next morning to see him, and he was not there, and I went the next night, the night the house was burned, to tell him that if I was him I would get my hay and barn insured." The question proposed by the government had been answered. The question proposed by the witness was not objected to nor was his answer thereto. The counsel for the prisoner should at once have objected to the inquiry, and moved to have it stricken out.

The court was not in fault. The counsel for the prisoner might have objected to the irresponsive remarks of the witness. He neither objected to them, nor moved to have them stricken out. There is rarely a trial in which witnesses do not make remarks which, upon strict law, are inadmissible. The proper course is to act at once, and object.

But if counsel allow irresponsive answers to be made without moving to have them stricken out, and without objection, and still can have exceptions, no verdict can be safe. The judge is not notified that the counsel will except to the testimony and has

a right to assume that no objection is relied upon, as none is made. If it had been, we must assume the ruling would have been correct. To permit this sort of practice would be to defeat the very ends of justice, and to encourage trickery and fraud. "Not having disclosed the character and ground of his objection," as Barrows, J., remarks, in 61 Maine, 175, "at the time, when, if it had any substance, he should have done, he cannot be permitted to wait with it as a cause for a new trial. Honest dealing with the court and the opposite party in a case, civil and criminal, requires that where an objection is made to a piece of testimony, apparently relevant and competent, . . the objection should be specifically set forth." But here no objection was even made. No action of the court was asked for; nor was the judge's attention called to the matter as it should have been.

III. John H. Benner, a brother of the defendant, was summoned as a witness and testified before the grand jury by whom the indictment was found. On the trial at *nisi prius* he was called as witness by and testified in favor of the prisoner. His testimony was material and exculpatory. The government called the foreman of the grand jury, by whom it was proved that the witness, in his examination before that body, had made statements under oath adverse to, and materially different from those to which he testified before the traverse jury. To this testimony the counsel for the prisoner objected.

Truth is desirable, from whatever source obtained. It is the very basis of justice. The exclusion of evidence is the exclusion of the very means of arriving at just conclusions. Exclude all evidence and the sacred lot alone remains as the foundation of judicial decision.

It is a rule of the common law, that the testimony of a witness may be contradicted by different and varying statements made at other and different times, either under oath or not. The evidence to the introduction of which exception is taken, is of that character. The truth from the lips of a grand juror is as important as from those of any other person. When his testimony is required in

the administration of the law, why should not his testimony be received?

A witness testifies to one set of facts before the grand jury. Before the traverse jury he testifies to another statement, differing from, and contradictory to his former statement in every essential particular. He has committed perjury in the one case or the other.

Truth is as desirable before the grand jury as before any judicial tribunal. The whole criminal jurisdiction of the state rests primarily with them. Indictments are found and trials had in consequence of their proceedings. Is perjury no offence in their presence? Can it be committed before them alone without infamy, and without fear of punishment? Is the grand inquest of the county, whose duty it is to "diligently inquire and true presentment make of all matters and things given" them "in charge," to be prohibited from the investigation of crimes committed in its presence?

The witness, it may be, told the truth before the grand jury. On the trial, suborned, seduced by sympathy, or swerved by prejudice, his statements false, perjurious, tending to the exculpation of the guilty prisoner, are offered in evidence. Are they to pass without contradiction or refutation, when the means of contradiction and refutation are at hand? Is the guilty prisoner to escape? The witness may be impeached by other and opposing statements made elsewhere. Is a grand juror any the less reliable, or any the less competent as a witness, than any other citizen, who may not have been a member of that body? Is a guilty and perjured witness to triumph in his crime? Or shall all the facts necessary to a just decision be disclosed, and the right prevail? The witness may be false against the prisoner. Is innocence to suffer the penalty of guilt when the testimony necessary for its proof is so readily accessible?

It is an axiom in the law of evidence that no testimony should be rejected unless greater evil is seen as likely to arise from its admission than from its rejection. What possible evils can arise from this evidence? Wherein does the testimonial trustworthiness of a grand

juror differ from that of any other citizen? What matters it whether he heard the contradictory and impeaching story of the witness in the street, or under oath and in the deliberations of the grand jury room—save that in the latter case it would be uttered under the highest sanctions for testimonial veracity. Let this evidence be excluded, and to the precise extent of the exclusion, the means for arriving at correct conclusions are withheld from the consideration of the jury. Injustice is done. The guilty escape. The innocent are punished. Such are, or may be, the results from the exclusion of relevant and material testimony.

It would be a strange and anomalous principle of public policy, which should specially clothe with impunity crime committed in the presence of a body impannelled to inquire into its existence, and when found to exist, to present it for punishment. It would be a discreditable denial of justice, which should exclude material and relevant testimony, whether needed for the conviction of the criminal, or required for the exculpation of the innocent. Where would be the policy of licensing mendacity without the fear of contradiction or of punishment?

It is apparent, therefore, that so far as the great end of judicial administration—justice—is concerned, there can be no principle of public policy requiring the exclusion of the evidence by a grand juror of the testimony of a witness before his body whenever it may become necessary for the ascertainment of the truth.

But it is urged that the secrets of the grand jury must be protected—that the oath of the grand juror prohibits their utterance. The juror is sworn the state's counsel, his fellows', and his own, to keep secret. But the oath of the grand juror does not prohibit his testifying what was done before the grand jury when the evidence is required for the purposes of public justice or the establishment of private rights. *Burnham* v. *Hatfield*, 5 Blackf., 21. "It seems to us," observes Ruffin, C. J., in the *State* v. *Broughton*, 7 Iredell, 96, "that the witness (who testifies before the grand jury) has no privilege to have his testimony treated as a confidential communication, but that he ought to be considered as depos-

ing under all the obligations of an oath in judicial proceedings and, therefore, that the oath of the grand juror is no legal or moral impediment to his solemn examination under the direction of a court, as to evidence before him, whenever it becomes material to the administration of justice." To the same effect was the decision of the supreme court of Indiana in *Perkins* v. *The State*, 4 Ind., 222. In *Com.* v. *Hill*, 11 Cush., 137, a member of the grand jury which found an indictment was held to be a competent witness on trial to prove that a certain person did not testify before the grand jury. In *Com.* v. *Mead*, 12 Gray, 167, it was held that the defendant for the purpose of impeaching a witness for the commonwealth, on the trial of an indictment, might prove that he testified differently before the grand jury. So, if to impeach a witness, evidence is offered of statements made by him before the grand jury, he may testify in rebuttal what those statements were. *Way* v. *Butterworth*, 106 Mass., 75. When a witness testifies differently in the trial before the petit jury from what he did before the grand jury, the grand jurors may be called to contradict him whether his testimony is favorable or adverse to the prisoner. So, in all cases when necessary for the protection of the rights of parties, whether civil or criminal, grand jurors may be witnesses. Such seems the result of the most carefully considered decisions in this country.

In *Low's case*, 4 Maine, 440, it was held that grand jurors might be examined as witnesses in court to the question whether twelve of the panel concurred or not in the finding of a bill of indictment. If the counsel of the grand jurors is to be kept secret at all events, the votes of the grand jurors are certainly as much a matter of secrecy as anything done or testified to before them. The action of a grand juror is more especially a matter of his own counsel than any statement of any one else before his body. The assertion that less than twelve concurred in an indictment involves necessarily the assertion of who did and of who did not so concur.

The opinion of the court demonstrates the propriety of the reception of the evidence offered. But, logically, it was admissible

only because otherwise injustice would ensue; because the require-
ment of secrecy is to be subordinated to the higher demands of jus-
tice. In *McLellan* v. *Richardson*, 13 Maine, 82, it appears that
one of the grand jurors was a witness, and it would seem testified
to facts occurring before the grand jury. "With regard to the
course pursued in the examination of the grand jurors," remarks
Weston, C. J., in delivering his opinion, "it must be understood
to have been assented to by the counsel for the defendant, and
therefore furnishes no ground of exception on his part." On the
hearing of the case before the full court the defendants' counsel
offered to prove that Robert Dunning, one of the panel before
whom the case was tried, had been a member of the grand jury by
whom the trespass in issue had been investigated; and to prove
by the county attorney that the subject-matter of the present mat-
ter had been investigated by the grand jury. But the court re-
fused to set aside the verdict for such cause. "Whatever examin-
ation was gone into before the grand jury," remarks Weston, C. J.,
"no bill was preferred against the defendant. It is not then to be
presumed, that any one of them was satisfied of his guilt. It is
further stated and not denied, that the jurors generally before the
trial commenced, were inquired of, whether they had formed any
opinion or were sensible of any bias upon their minds, in relation
to the case. Upon such inquiry every juror conscious that he did
not stand indifferent, should, and it may be presumed would, dis-
close the fact." The conclusion of the court, it will be perceived,
is based upon the conduct of the juror under the circumstances.
"Proof that the subject-matter of the present action had been in-
vestigated by the grand jury" would have been hearsay—and would
have been ineffectual to disturb the verdict and therefore was prop-
erly excluded. In *State* v. *Knight*, 43 Maine, 128, one Rice, a
witness for the state, on direct examination, testified "that on the
afternoon of the day succeeding the death of the deceased he saw
something on the sleeve of the shirt of the prisoner, which he
thought was blood; and on cross-examination, that he was a wit-
ness before the magistrate and before the coroner's inquest. In

answer to the prisoner's inquiry whether he had testified before, that he saw blood on the prisoner's wrist, he answered in the affirmative; and then the question was proposed in behalf of the prisoner, if this was the first time he had so testified except before the grand jury. This question being objected to, was excluded. It is not controverted by the prisoner's counsel that a witness is not permitted to disclose evidence before the grand jury. It will be observed that no authorities were cited in reference to the question now under consideration; that no discussion was had of the principles involved, but that the counsel for the prisoner assented to the principle that, witness is not permitted to disclose evidence before the grand jury and the court without consideration or investigation accepted the surrender. But it is to be observed, that, irrespective of the consideration already discussed, the question was properly excluded on the "established rule, that a witness cannot be called upon to state his testimony given on a former occasion in a trial where the same question is relevant."

The question we have been considering was neither argued, discussed or decided in any case in this state. The decision in *Low's case* can only be sustained upon principles, which sanction the ruling on this point in the case at bar. The two other cases to which we have referred were decided upon satisfactory principles. They cannot be considered as adverse to the conclusion to which we have arrived. Indeed the question here raised has never been authoritively decided before in Maine.

IV. The counsel for the prisoner asked Holland when he was on the stand, whether or not he ever told the witness Lincoln that he did not authorize the commencement of an action against Benner. He then proposed to Lincoln this question; "what did he (Holland) say about commencing an action against Mr. Benner?" An objection being interposed, the court remarked "that was collateral, and you must abide by it. I exclude it."

This ruling was correct. The inquiry of Holland was in relation to a collateral matter—what he said to a witness. The rule is well settled that a witness cannot be cross-examined on collat-

eral matters in order to contradict and impeach his testimony. What Holland said to another witness about a suit was clearly collateral. *Bell* v. *Woodman*, 60 Maine, 465 ; *Coombs* v. *Winchester*, 39 N. H., 13 ; *Page* v. *Homans*, 14 Maine, 478.

V. The answers to the questions proposed to a witness as to whether Holland said he mistrusted any one—or had suspicion of any one—were properly excluded. Holland was a witness. What he said to any one was hearsay. His answers were not sought for the purpose of contradicting any previous statements he may have made. They were but hearsay and inadmissible.

VI. This question was proposed to Emilus W. Carter: "Was there anything said there that night about seeing Benner there?" and the answer was excluded. The question seeks for hearsay. Nothing indicates that the answer would be proper. But if proper, it would be immaterial; for to the next question he answered that he heard nothing said.

VII. Before an exception that a question is not answered can be sustained, it must appear that the inquiry was pertinent. It does not appear that the question to Jacob R. Sinclair—"you did not come till they sent for you?" was either pertinent or material. It was cross-examination. The limits to collateral cross-examination are determinable by the presiding justice.

VIII. The presiding justice after calling the attention of the jury to their duties and responsibilities, briefly alluded to those of the executive, calling their attention to the duty of the governor and council to revise the evidence, and after revision, their power to pardon, commute or carry into execution the sentence of the law.

The object of the presiding justice was to show that the verdict of the jury was not final and irreversible, that it does not take away life. There was no misstatement of the law—nothing of which the prisoner can justly complain.

The allusion to the fact that in times past there had been repeated omissions to inflict the penalty of the law was by way of suggestion to the executive that the law had been disregarded, not by way of intimation that such would be the case in the future.

IX.  Complaint is made that the testimony of the witness Bailey is inaccurately stated.  It is denied that such is the case.  But suppose it to be so, the counsel for the defence must have perceived it, and it was his duty to call the attention of the court to the fact, if in any instance from misapprehension the testimony of a witness had been erroneously stated.  If there was a stenographic reporter, his minutes were forthcoming for the correction of any mistakes in addition to those of the counsel.  But on examining the evidence as reported, no error is perceived.

X.  It is a part of the duty of a presiding justice to call the attention of the jury to the several positions respectively assumed by the counsel on the one side and the other, so that thereby the jury may the more distinctly perceive the precise question submitted to them for their determination.  In doing so, no opinion was given as to the facts on the one side or the other.  No preponderance is given to either the theory of the counsel for the prisoner or for the state.

XI.  The remark that the question depended principally upon that of time, was no expression as to the guilt or innocence of the prisoner.  The remark that the question depended on space would have been equally true and unobjectionable.  If the crime of arson was committed it was essential that the incendiary should be at the place at the time of its commission.  The time and place where the accused was when the fire was set, if it was set, were elements material to the establishment of guilt.

XII.  The remark that if the prisoner falsified as to time, it was a circumstance strongly evidentiary of guilt, was not merely unobjectionable, but strictly and accurately correct.  Crime is ordinarily proved by circumstantial evidence.  Truth is the reliance of innocence.  Falsehood is the resort of crime.  All true facts are consistent with each other.  If the prisoner was innocent, there was no reason for the withholding a true fact.  Still less was there for uttering a falsehood.  Falsehood is evidence of crime. Every falsehood uttered by way of exculpation becomes an article of circumstantial evidence of greater or less inculpatory force.  A

false *alibi* disproved is a circumstance indicative of guilt, though as the presiding justice very justly remarked, not conclusive.

XIII.   The court instructed the jury that the prisoner was a competent witness, but that the force and effect of his testimony was wholly for their consideration; and remarked that "if the prisoner is guilty, you must come to the conclusion that his brother John was a confederate." The justice of the remark is abundantly manifest from the testimony of the brothers. The remark was hypothetical, not positive. It was based hypothetically upon their finding the prisoner guilty, as to which no opinion whatever was expressed. The issue before the jury was as to the guilt or innocence of the prisoner. The guilty confederacy of the brother was not a fact for the determination of the jury. If the jury found the prisoner innocent or guilty they had fully discharged their duty. Nothing more remained for them to do. Whether the brother was or was not a confederate was not the subject of inquiry on their part.

XIV.   In the course of the charge, the presiding justice observed as follows:—"Then it is contended that there were two individuals who saw Benner there before the fire on this evening, and you have heard the testimony and arguments in relation to that. If you believe he was there perhaps you would not hesitate to believe that he was the perpetrator of this crime. Then it is said that he made threats to burn the building, &c., and it is contended that he carried that threat into execution." The prisoner denied his presence at the house of Holland at or near the time of the fire. Two witnesses on the part of the state testified that he was there. If the accused was there, then in denying the fact he was guilty of exonerative and perjurious falsehood. But falsehood—exonerative and perjurious falsehood is evidentiary of guilt. Such is the rule of law. No opinion as to the fact of guilt was given. No assertion as to its existence was made. "Perhaps the jury would not hesitate," implies that perhaps they might hesitate. Whether they would or would not "hesitate to believe that he (the respondent) was the perpetrator of the crime," was the question

submitted to the jury and not withdrawn from their consideration by any assertion of fact, or expression of opinion.

The statute of 1874, c. 212, requires that "the presiding justice shall rule and charge the jury, orally or in writing upon all matters of law arising in such cases (jury trials) but shall not during the progress of the trial, including the charge to the jury, express an opinion upon issues of fact arising in the case." As the court are to rule upon matters of law arising in the case, it will be their duty to state the principles of law applicable to the different phases it may present. As they are to charge, it is incumbent upon the court to call the attention of the jury to the evidence on the one side and the other. Indeed, in a long and complicated case, the jury taking no minutes of the evidence, the result would be somewhat a matter of chance, or dependent on the skill and eloquence of counsel rather than the merits of the cause, unless their attention was directed to the issues of fact respectively raised and to the evidence bearing upon those issues. The statute contemplates that the judge shall charge the jury subject only to the prohibition that he shall not "express an opinion upon issues of fact arising in the case." With the exception of this limitation, there is no restriction whatever upon the rights, duties or powers of the court in the trial of a cause. That the presiding judge may state the grounds respectively taken by counsel—that he may rule the law as applicable to the hypothesis assumed by the one and the other is assumed in the idea of a charge. The authoritative expression of opinion "as to the issues of fact arising in the case" is the extent and limit of the prohibition.

The correctness of the charge is not to be determined by mere isolated remarks without reference to their connection with what precedes and follows. It must be regarded as a whole. Upon a careful examination, no error is perceived in the legal principles therein stated. There is no judicial expression of opinion "upon issues of fact arising in the case." No fact was withdrawn from the consideration of the jury. The force and effect of the testimony—the guilt or innocence of the prisoner—were explicitly and

fully submitted to the judgment of the jury, and upon them must rest the responsibility of their conclusions.

*Exceptions overruled.*

CUTTING, WALTON, DICKERSON, DANFORTH, VIRGIN and PETERS, JJ., concurred.

