PEOPLE OF PORTO RICO, Plaintiff and Appellee, *v.* GERMÁN ARENAS ALEMAÑY, Defendant and Appellant.

No. 3537. Argued December 13, 1928.—Decided January 21, 1929.

A. *Ramírez Silva, J. Alemañy* and *G. Encarnación Santana* for the appellant. *José E. Figueras* for the appellee.

Mr. Justice Texidor delivered the opinion of the court.

A duly impaneled jury in the District Court of Mayagüez found Germán Alemañy guilty of rape on an information which charged that on January 23, 1927, he had sexual relations with María Belén Flores Asencio, a girl of less than fourteen years of age who was not his wife. The defendant moved for a new trial which was denied. The court rendered judgment sentencing the defendant to five years in the penitentiary at hard labor and the defendant has appealed.

Seven errors are assigned by the appellant and five of them refer to the evidence.

The first assignment is that the court erred in allowing the examination of witness María Belén Flores Ascencio by the district attorney to include leading questions.

It is necessary to read this examination in order to realize the situation and the special position in which the witness was placed. It is the case of a girl called to testify in the presence of a large number of men whom she did not know about one of the acts whose publicity is avoided instinctively by every woman who preserves a trace of modesty, and when she was asked questions which, however carefully worded,

are always course because obnoxious to extremely delicate feelings, she remained silent, at times perhaps through ignorance of the real significance of the question and at others by reason of the natural revolt of modesty and indomitable aversion to exhibiting the picture of her downfall before the public.

The attitude of the witness can not be considered hostile within the real meaning of that word. She had no feeling of hostility against justice and its representatives; but she was hostile to the exhibition and revelation before the public of that which for her was the greatest shame of her life. And for the purposes of the trial the result was the same.

With lamentable frequency the tendency appears in all kinds of trials to convert the law of evidence into a series of impregnable rules of such extreme technicality that they lead to the concealment rather than to the display of the truth. Neither is that the purpose of the law, nor can its application cease to be humane and logical, inasmuch as it was written for humans and logic is the soundest standard for reaching the truth in a prosecution. Following this theory, section 153 of our Law of Evidence is made to read as follows:

"A question which suggests to the witness the answer which the examining party desires is denominated a leading or suggestive question. On a direct examination, leading questions are not allowed, except in the sound discretion of the court, under special circumstances, making it appear that the interests of justice require it."

The interests of justice are not exclusively the interests of the People or of the accused. They are those of society as a whole, all being interested in the triumph of justice over injustice. And they have no higher representation than that of the judge who directs the proceedings and whose interest is social and not that of the parties in the case. For that reason the law has given to the court the discretion to allow practical exceptions to the rule forbidding leading questions whenever they may be required by the highest of interests.

In volume 5 of Chamberlayne's Modern Law of Evidence, pages 5324 *et seq.*, paragraphs 3714 *et seq.*, we find this matter discussed with citations from numerous authorities.

"Whether a question is a leading one and should be excluded is a matter peculiarly for the determination of the presiding judge, guided by sound reason, and his decision in regard thereto is ordinarily considered as final and not subject of review by the appellate court.

     *       *       *       *       *       *       *

"Where a witness is clearly hostile to the party by whom he is produced, or appears to be withholding evidence, the presiding judge will allow the counsel of such party more latitude in respect to questions, which might otherwise be excluded as leading. The situation frequently occurs in the case of witnesses called by the state to testify in criminal prosecution, when, owing to their friendship for the accused, they are unwilling to testify against him. In all such cases, of apparent hostility or unwillingness, the presiding judge may, as a matter of sound administration, permit leading questions to be asked, as an aid in eliciting the truth."

The author likewise speaks of as cases in which the rule of excluding leading questions is relaxed those of the testimony of children, feeble minded, aged and illiterate persons. Of the cases cited in the notes an interesting one because of the reasoning is that of *State* v. *Benner,* 64 Me. 267, in which it is said that if a witness is hostile to the party who called him, the same reason which authorizes cross-examination more or less vigorous equally requires it when the party finds that the witness whom the necessities of his case have compelled him to call, is evasive or false.

Of the cases cited by the *fiscal* of this court in his brief that of *State* v. *Simes,* 85 Pac. 914, is very important because it is held therein that to permit certain leading questions was something within the sound discretion of the court. The case was decided by the Supreme Court of Idaho and the crime was similar to the one in the case now on appeal before us. The case of *State* v. *Bauerkemper,* 64 N. W. 609, is also important. It was a case of seduction. The seduced woman,

as appears from the opinion, refused to relate in her testimony and of her own accord all that had occurred and the court permitted leading questions which were objected to. The court expressed itself as follows:

"At one time, in overruling the objection, the court said, 'It appears difficult to induce the witness to tell the story of her own accord, and this objection is overruled.' In another instance the court said: 'Well, it is leading: but it appears difficult for this witness to bring herself up to the point of answering. Objection overruled.' We conclude from the record before us that there was no abuse of discretion resting in the court, in permitting the course of examination pursued in this instance."

The doctrine in *People* v. *Plata,* 36 P.R.R. 530, is not the same as that of the case before us. In that case a witness was hostile to the party who called him and it was sought to contradict him by means of certain evidence without giving him an opportunity to explain and he was not allowed under the cloak of contradiction to introduce evidence which otherwise would have been inadmissible.

The testimony of the witness is convincing that the court used its discretion wisely and in furtherance of justice.

The first assignment of error is without merit.

So also is the second assignment that the court erred in not striking out the answer of the injured woman as follows: "Yes, sir, the fact is that he took me away with him and dishonored me there." At the trial the court was asked to strike out this answer because, in the opinion of the defense, it was a conclusion of the witness.

Considering the conditions of the witness, we do not see how that answer can be called a conclusion when really it is nothing more than the ordinary and usual manner of stating a fact. The witness used the phrase which is employed constantly by our people to designate the fact of the loss of virginity in cases similar to the one before us. "He disgraced me" or "he dishonored me" has not in the present case the meaning which the appellant seeks to ascribe to it.

In order to reach that idea, which is not a conclusion, there is no need for a mental process involving the considerations of honor, deceit, sexual abuse, etc., and to propose, with all that, the conclusion that the injured woman has lost the good name which she merited previously, has forfeited the good opinion of society and has fallen into evil. Here, in the present case and bearing in mind the person who was speaking, those words mean that "he had sexual intercourse with me" and nothing else.

As regards the third assignment that the court committed error in permitting the maidenhood of the woman to be proved by what the appellant calls secondary evidence, that is, oral evidence, and contending that the best evidence would be a negative certificate from the Civil Registry, we hold that there was no such error. We believe that evidence of affirmation of facts can and should be obtained from the Civil Registry and it is not an office from which evidence by exclusion or negative evidence can be obtained. But apart from that, it would be impossible to secure the evidence which seems to be required by the appellant, because it would be necessary to obtain negative certificates from each and every Civil Registry of the Island; and even then it would not be sufficient inasmuch as the defense could allege that those certificates showed that no marriage had been contracted in Porto Rico, but that it might have been contracted elsewhere.

Apparently, the fourth assignment of error is more important. It reads as follows:

"The court committed error in admitting in evidence the statements made by the alleged injured woman to her mother four days after the occurrence of the supposed facts."

As appears from the evidence, the victim was taken by the accused to the home of Isaac Ramírez where she remained four days while her mother was looking for her. When her mother found her the first words from her daughter were:

"Mother, Germán Alemañy owes me my honor." Such was the testimony of the mother, Ana Asencio, and the defense moved to strike it out as not a part of the *res gestae.*

In *People* v. *Calventy,* 34 P.R.R. 375, this court defined the real purpose and foundation of the doctrine of *res gestae.* It is not solely a question of the time elapsed, nor the materiality of the time; but it is something psychological and spiritual. A quotation is made in that case from 3 Wigmore, 738, which it is well to repeat here as follows:

" 'It is to be observed that the statements *need not be strictly contemporaneous* with the exciting cause; they may be subsequent to it, provided there has not been time for the exciting influence to lose its sway and to be dissipated. The fallacy, formerly entertained by a few courts, that the utterance must be strictly contemporaneous (*post,* sec. 1756), owes its origin to a mistaken application of the Verbal Act doctrine . . . .

" 'Furthermore, there can be *no definite and fixed limit* of time. Each case must depend upon its own circumstances . . . .

" 'Since the application of the principles thus depends entirely on the circumstances of each case, it is therefore impossible to regard rulings upon this limitation as having in strictness the force of precedents. To argue from one case to another on this question of "time to devise or contrive" is to trifle with principle and to cumber the records with unnecessary and unprofitable quibbles. There is a lamentable waste of time by Supreme Courts in here attempting either to create or to respect precedents. Instead of struggling weakly for the impossible, they should decisively insist that every case be treated upon its own circumstances. They should, if they are able, lift themselves sensibly to the even greater height of leaving the application of the principle absolutely to the determination of the trial court. Until such a beneficent result is reached, the lucubrations of Supreme Courts over the details of each case will continue to multiply the tedious reading of the profession.' " Id. section 1750, pp. 744–751.

And later in the opinion it was said:

"We need not speculate as to whether or not it would be entirely safe, or premature or perilous, at this time and in this jurisdiction, to attempt an Elysian flight through the altitudinal zone of the penultimate statement last above quoted. For the present, it will suffice to say that unless and until an appellant can show an open

disregard or plain departure from the principle involved, we shall not be disposed to interfere with the exercise of a sound discretion by the trial judge.''

In order to illustrate the difficulties created by the interpretations of the doctrine, Wigmore quotes the expression of Chief Justice Beasley in *Hunter* v. *State*, 40 N.J.L. 536, as follows:

''I think I may safely say that there are few problems in the law of evidence more unsolved than what things are to be embraced in those occurrences that are designated in the law as *'res gestae'*.''

And the more definite one of Chief Justice Bleckley in *Cox* v. *State*, 64 Ga. 374, 410, as follows:

"The difficulty of formulating a description of the *'res gestae'* which will serve for all cases seems insurmountable. To make the attempt is something like trying to execute a portrait which shall enable the possessor to recognize every member of a numerous family.''

In the present case the injured woman had been four days without communicating with her mother. Her first words on meeting her were those quoted. It is not a question of time. That utterance was the first spontaneous and perhaps irresistible exclamation, without premeditation and without any other deliberate purpose than to inform her mother of her disgrace, as if it had occurred five minutes before. In that sense and in accordance with the circumstances of the case, the evidence was properly admitted and the motion to strike out properly overruled.

Nor was there error in the admission of the testimony of the district attorney. He testified that one day in February the accused was in his office without having been subpoenaed and that voluntarily and without being examined in regard to the case the accused said to him that it was true that he had carried off the girl and had had sexual intercourse with her, but had done so because the girl's mother had told him to take her. Considering the circumstances under which the witness heard the statements of Alemañy, without formal

examination and without testifying for the purpose of an investigation, it was proper for the district attorney to testify as he did. The quotation to this effect made by the *fiscal* of this court in his brief (Underhill on Criminal Evidence, par. 133, p. 259) is correct.

The sixth and seventh assignments of error refer to the refusal of the court to allow or sustain motions for nonsuit and for a new trial.

An examination of the evidence in the present case shows that granting a motion for nonsuit would have been a most serious error. No fuller evidence could have been introduced in the case than that which appears from the record.

Counsel for the accused moved for a new trial. No showing is made therein of diligence to obtain the evidence alleged to have been subsequently discovered, as was required in *People* v. *Díaz,* 5 P.R.R. 197, and *People* v. *Milán,* 7 P.R.R. 442. As regards the affidavits, they are of some witnesses who testified at the trial and could have been cross-examined, and witnesses who made statements which perhaps could have been destroyed or modified at the proper time and occasion by cross-examination. And the affidavit of witness Valentín has no elements to justify the granting of a new trial.

The judgment appealed from must be affirmed.