EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* GERMÁN ARENAS ALEMAÑY, acusado y apelante.

No. 3537.—*Sometido:* Diciembre 13, 1928. *Resuelto:* Enero 21, 1929.

*A. Ramírez Silva, J. Alemañy* y *G. Encarnación Santana,* abogados del apelante; *José E. Figueras,* abogado de *El Pueblo,* apelado.

EL JUEZ ASOCIADO SEÑOR TEXIDOR, emitió la opinión del tribunal.

Un jurado constituido en forma debida, en la Corte de Distrito de Mayagüez, rindió un veredicto declarando a Germán Alemañy culpable del delito de violación, de acuerdo con una acusación en la que, en esencia se le imputó que en 23 de enero de 1927 tuvo comercio carnal con la menor de catorce años María Belén Flores Asencio, que no era su esposa. El acusado presentó una moción de nuevo juicio, que fué denegada. Y la corte dictó sentencia por la que condenó al acusado a la pena de cinco años de presidio con trabajos forzados. De esa sentencia apela el acusado.

Se señalan por el apelante siete errores, de los que cinco se refieren a materia de prueba.

Como primer error se señala que se admitiera que el fiscal hiciera a la testigo María Belén Flores Asencio un interrogatorio a base de preguntas sugestivas.

Es necesario leer este interrogatorio, y tener presente la situación en que la testigo se encontraba, y sus condiciones especiales. Se trata de una niña que se encuentra en el

caso de declarar ante un crecido número de hombres desconocidos para ella, uno de los actos cuya publicación, de una manera instintiva, evita toda mujer que conserve una traza de pudor; y ella, cuando se le hacen esas preguntas que, por muy cuidadosamente que se expresen, son siempre rudas, ya que hieren sentimientos extremadamente delicados, permanece muda, quizá en alguna ocasión por ignorancia del verdadero significado de la pregunta, y en otras ocasiones por la natural rebelión del pudor, y la indomable aversión a exhibir ante el público el cuadro de su caída.

No es que en la verdadera acepción de la palabra "hostil" esté de lleno la actitud de la testigo. Ella no tiene un sentimiento de hostilidad contra la justicia y sus representantes; pero sí lo tiene contra la exhibición y la revelación ante el público, de aquello que constituye para ella la mayor vergüenza de su vida. Y el resultado, para los fines del procedimiento, es el mismo.

Con lamentable frecuencia aparece en toda clase de juicios, la tendencia a convertir la ley de evidencia en una serie de reglas impregnadas de un tan extremado tecnicismo, que, más que a la obtención de la verdad, conducen a su obscurecimiento. Ni ése es el propósito de la ley, ni su aplicación puede dejar de ser humana y lógica, ya que para humanos se escribió, y ya que la lógica es la más sana norma para llegar a la verdad en un proceso. Siguiendo esta teoría se escribió el artículo 153 de nuestra Ley de Evidencia, que dice así:

"Artículo 153.—Una pregunta que sugiere al testigo la respuesta deseada por la parte examinante, se denomina pregunta capciosa. En un interrogatorio directo no se permiten las preguntas capciosas, a no ser que, a juicio del tribunal, bajo circunstancias especiales, resultaren convenientes a los intereses de la justicia."

Los intereses de la justicia no son, exclusivamente, los del Pueblo, o los del acusado: son los de la sociedad toda interesada en que lo justo triunfe sobre lo injusto. Y no tienen más alta representación que la del juez que dirige el

procedimiento, y encauzar los debates, y cuyo interés es el social, no el de las partes en el caso. Por esa razón, la ley ha confiado a la discreción del tribunal el permitir que aquella regla que impide las preguntas capciosas, tenga sus excepciones prácticas, cuando el más alto de los intereses lo requiere.

En la obra de Chamberlayne "The Modern Law of Evidence," en el volumen V, páginas 5324 y 5332, párrafos números 3714 a 3720, encontramos tratada esta materia, con gran número de autoridades.

"Si la pregunta es sugestiva o no, y debe ser excluida, es una cuestión peculiarmente para la determinación del Juez que preside, guiado por la sana razón, y su decisión con respecto a esto, se considera generalmente como final, y no sujeta a revisión por la corte de apelación.

\* \* \* \* \* \* \*

"Cuando un testigo es claramente hostil a la parte que le presenta, o aparece estar rehusando evidencia (withholding evidence) el juez que preside concederá al testigo mayor latitud con respecto a preguntas que en otro caso pudieran ser excluidas como sugestivas. Esta situación surge frecuentemente en casos de testigos llamados por el Estado para declarar en procesos criminales, cuando, debido a su amistad con el acusado, ellos no quieren testificar contra aquél. En tales casos, de aparente hostilidad, o renuencia, el juez que preside puede, como materia de sana administración, permitir que se hagan preguntas sugestivas, como un auxiliar para que se obtenga la verdad."

El autor expone asimismo como casos en que se da laxitud a la regla de no permitir preguntas sugestivas, los de la declaración de un niño, o persona mentalmente deficiente, ancianos, y analfabetas. De los casos que en las notas se citan nos parece interesante, por el razonamiento, el de *State* v. *Benner*, 64 Me. 267, donde se dice que en el caso de que el testigo sea hostil a quien lo presenta, la misma razón que autoriza el contra-interrogatorio más o menos vigoroso, lo autoriza o requiere cuando la parte que presenta a un testigo, que por las necesidades del caso ha tenido que llamar, le encuentra en su declaración evasivo o falso.

De los casos que cita en su alegato el fiscal de este tribunal, el de *State* v. *Simes,* 85 Pac. 914, es importantísimo, por cuanto en él se sostiene que el permitir ciertas preguntas sugestivas fué algo que pertenecía a la sana discreción de la corte. El caso fué resuelto por la Corte Suprema de Idaho; y en él se trataba de un delito como el del caso en apelación ante nosotros. El caso de *State* v. *Bauerkemper,* 64 N.W. 609, es también importante. Se trataba en él de un delito de seducción. La seducida, por lo que de la opinión se deduce, se resistía a decir, en su declaración, y por su propio impulso, todo lo ocurrido; y la corte permitió preguntas sugestivas, que fueron objetadas. La corte se expresó así:

"En una ocasión, al desestimar una objeción, la Corte dijo: 'Parece difícil inducir a la testigo a hacer voluntariamente una relación de lo ocurrido, y se declara sin lugar la objeción.' En otra ocasión la corte dijo: 'Sí, señor, la pregunta es capciosa; pero parece difícil para la testigo contestar las preguntas que se le hagan. Se declara sin lugar la objeción.' Después de examinar los autos que tenemos a la vista llegamos a la conclusión de que no ha habido abuso de discreción por parte de la corte sentenciadora al permitir el curso del examen que se siguió en este caso.".

La doctrina del caso *El Pueblo* v. *Plata,* 36 D.P.R. 590, no es la de este caso ante nosotros. Allí se trató de un testigo hostil a la parte que lo presentó, y a cuyo testigo se intentó contradecir con cierta prueba, sin darle oportunidad a explicarse, y no se permitió que bajo el disfraz de la contradicción, se presentara prueba que de otra manera sería inadmisible.

La lectura de la declaración de la testigo, convence de que la corte usó de su discreción en una forma sabia y una medida prudente, y en interés de los fines de la justicia.

El error señalado bajo el número primero no existe.

■ Tampoco existe el error señalado bajo el número Segundo, o sea el no haber eliminado la contestación de la perjudicada, que dijo: "Sí, señor, me pasó que él me llevó a

mí y me deshonró por allí.'' Se solicitó en el juicio la eliminación de esta contestación, por ser una conclusión de la testigo, según creía la defensa.

No vemos, dadas las condiciones de la testigo, que pueda llamarse una conclusión a lo que, en realidad, no es otra cosa que una manera, vulgar y corriente, de exponer un hecho. La testigo usa la frase que es constantemente usada por nuestro pueblo para designar el hecho de la pérdida de la virginidad en casos como el que tratamos. ''Me desgració'' o ''me deshonró,'' no tienen en este caso el sentido que la parte apelante le quiere dar. No se requiere, para llegar a ese concepto, que no conclusión, un procesa mental en el que vayan envueltas las consideraciones del honor, del engaño, del abuso sexual, etc., y proponer, con todo ello, la conclusión de que la persona ofendida, ha perdido el buen concepto que merecía antes, ha desmerecido ante la sociedad, y ha caído en el mal. Aquí, en este caso, y teniendo en cuenta la persona que habla, esas palabras son la equivalencia del concepto ''tuvo actos carnales conmigo,'' y no otra cosa.

En cuanto al tercer señalamiento, en que se imputa como error de la corte el permitir que la soltería de la ofendida se probara por lo que llama el apelante prueba secundaria, o sea por prueba testifical, sosteniéndose que la mejor prueba sería la certificación negativa del Registro Civil, declaramos que tal error no existe. Creemos que del Registro Civil puede y debe venir prueba de afirmación de hechos; y no es una oficina de la que se puede obtener prueba por exclusión, o negativa. Pero, aparte de esto, sería imposible hacer la prueba que parece requerir la parte apelante, porque habría que obtener la certificación negativa de todos y cada uno de los Registros Civiles de la Isla; y aun no sería suficiente, ya que, puestos a exigir, podría la defensa alegar que esas certificaciones probaban que no se había contraído el matrimonio en Puerto Rico, pero pudo contraerse en otra parte.

■■ Más importancia, aparente, tiene el cuarto señalamiento de error. Se propone así:

"Cuarto error.—La corte cometió error al admitir como admitió las manifestaciones hechas por la presunta ofendida a su madre cuatro días después de ocurridos los supuestos hechos."

La ofendida, según resulta de la prueba, fué llevada por el acusado a la casa de Isaac Ramírez, en donde estuvo cuatro días, mientras la madre la buscaba. Cuando la madre la encontró, las primeras palabras que le dirigió la hija, fuerón: "Mamá, Germán Alemañy me debe mi honra." Así lo declaró la madre Ana Asencio; y la defensa pidió la eliminación, por no formar parte del *res gestae*.

En el caso *El Pueblo* v. *Calventy,* 34 D.P.R. 390, se ha definido por este tribunal el verdadero propósito y el fundamento de la doctrina del *res gestae;* no es solamente cuestión de tiempo transcurrido, no es la materialidad del tiempo; es algo psicológico, espiritual. Cítanse allí las palabras del tratadista Wigmore, que en esta decisión conviene repetir:

"Debe observarse que las manifestaciones *no tienen que ser estrictamente contemporáneas* con la causa excitante; pueden ser subsiguientes a ella, siempre que no haya habido tiempo para que la influencia excitante pierda su influjo y sea disipada. La falacia, anteriormente tenida en cuenta por algunas cortes, de que la manifestación debe ser estrictamente contemporánea (*post,* sec. 1756) debe su origen a la aplicación errónea de la doctrina del acto verbal. . . .

"Además, no puede haber *ningún límite de tiempo definido y fijo.* Cada caso debe depender de sus propias circunstancias. . . . .

"Toda vez que la aplicación del principio depende, pues, enteramente de las circunstancias de cada caso, es por tanto imposible considerar las resoluciones sobre esta limitación como que tienen en rigor la fuerza de precedentes. El discutir de un caso a otro acerca de esta cuestión de 'tiempo para idear o tergiversar' es jugar con el principio y llenar los autos de sutilezas innecesarias e infructuosas. Hay una pérdida lamentable de tiempo por parte de las cortes supremas en tratar aquí bien de establecer o respetar precedentes. En vez de esforzarse débilmente por lo imposible deben decisivamente insistir en que todo caso sea tratado por sus propias circunstancias. Debieran, si pueden hacerlo, levantarse perceptiblemente aun a la

mayor altura de dejar la aplicación del principio absolutamente a la determinación de la corte sentenciadora. Hasta que sea alcanzado ese resultado benéfico las lucubraciones de las cortes supremas sobre los detalles de cada caso continuarán multiplicando la lectura tediosa de la profesión.'' Id., sec. 1750, págs. 744-751.

Y se dice luego en la opinión:

''No tenemos que especular respecto a si sería o no enteramente conveniente, o prematuro, o peligroso, ahora y en esta jurisdicción el pretender hacer un vuelo en los Campos Elíseos por la zona altitudinal del penúltimo párrafo arriba citado en último término. Por ahora será bastante con decir que a menos que y hasta tanto un apelante pueda demostrar una abierta desatención o clara desviación del principio envuelto, no estaremos dispuestos a intervenir con el ejercicio de la sana discreción del juez sentenciador.''

El mismo tratadista Wigmore, para dar relieve a las dificultades creadas por las interpretaciones de la doctrina, cita la frase del *Chief Justice* Beasley en *Hunter* v. *State,* 40 N.J.L. 536:

''Creo que puedo decir sin temor a equivocarme, que hay pocos problemas en la ley de evidencia que estén más enredados que aquellos que abarcan los casos que la ley designa como *res gestae.''*

Y la más terminante del *Chief Justice* Bleckley en *Cox* v. *State,* 64 Ga. 374, 410:

''La dificultad de formular una descripción del *res gestae* que sirva para todos los casos parece insuperable. Intentarlo es algo como probar a hacer un retrato que ponga al poseedor en condiciones de reconocer a todos los miembros de una numerosa familia.''

En este caso, la perjudicada ha estado cuatro días sin tener comunicación alguna con la madre. Sus primeras palabras al encontrarse con ella, son las antes expresadas. No es cuestión de tiempo: esas frases son la exclamación primera, espontánea, y quizás irrefrenable, sin previa meditación, sin lugar a otro propósito deliberado que exponer a la madre su desgracia, como si ella hubiera acaecido cinco minutos antes. En ese sentido, y de acuerdo con las circunstancias del caso, la prueba está bien admitida, y la eliminación bien denegada.

■ No fué error tampoco la admisión de la declaración hecha por el fiscal. Éste declaró que un día del mes de febrero estuvo el acusado en su oficina, sin haber sido citado, y sin que se le preguntara en cuanto al caso, y voluntariamente le dijo que era verdad que se había llevado la muchacha, y había tenido actos carnales con ella, pero lo hizo porque la madre de la muchacha le dijo que se la llevara. En las condiciones en que el declarante oyó las manifestaciones de Alemañy, sin un examen formal, sin una declaración para los fines de la investigación, el fiscal pudo declarar como lo hizo. La cita que a este propósito hace el fiscal de este tribunal en su alegato (Underhill on Criminal Evidence, párrafo 133, pág. 259) es correcta.

En cuanto a los señalamientos de error sexto y séptimo, se refieren, a la negativa de la corte a conceder o sostener una moción de *nonsuit*, y a la de conceder un nuevo juicio.

Un estudio de la prueba en este caso, convence de que la concesión de una moción de *nonsuit* hubiera sido el más grave de los errores. No podía, en el caso, presentarse más completa evidencia que la que del récord aparece.

■ La defensa del acusado presentó una moción de nuevo juicio. De ella no aparece la indicación de las diligencias hechas para obtener la prueba que se dice fué posteriormente descubierta, como hemos exigido en los casos *El Pueblo* v. *Díaz*, 5 D.P.R. 202, y *El Pueblo* v. *Milán*, 7 D.P.R. 455. Y con respecto a las declaraciones juradas, ellas son de algunos testigos que declararon en el juicio, y a los que se pudo repreguntar, y testigos que hicieron afirmaciones que pudieron ser quizá destruidas o modificadas en su propio tiempo y ocasión, el contra-interrogatorio. Y la declaración del testigo Valentín, no tiene elementos para que se conceda un nuevo juicio.

*Debe confirmarse la sentencia apelada.*