EL PUEBLO DE PUERTO RICO, demandante y recurrido, *v.* WILLIAM D. FOSTER, acusado y peticionario.

*Número:* O-80-299      *Resuelto:* 19 de junio de 1980

---

([6]) W. F. Young, Jr., *"Incontestable"—As to What?*, 1964 U. Ill. L.F. 323–329.

*Carmen Ana Rodríguez Maldonado,* de la Sociedad para la Asistencia Legal, abogada del peticionario; el recurrido no compareció.

### RESOLUCIÓN

A la anterior petición de *certiorari,* no ha lugar.

Lo acordó el Tribunal y certifica el Secretario. El Juez Presidente Señor Trías Monge lo expediría y se reserva el derecho a expresarse posteriormente. El Juez Asociado Señor Negrón García emitió voto explicativo.

(Fdo.) Ernesto L. Chiesa
*Secretario*

—O—

Voto explicativo del Juez Asociado Señor Negrón García.

San Juan, Puerto Rico, a 19 de junio de 1980

Coincidimos con la negativa del Tribunal a expedir, pues somos del criterio de que es improcedente el descubrimiento de prueba en la etapa de la vista preliminar. Esta conclusión toma como base dos fuentes, a saber: (1) que la Regla 23 de Procedimiento Criminal vigente no lo autoriza; y (2) que su concesión nunca fue contemplada.

Sin embargo, el caso rebasa este dictamen, y nos permite exponer ciertas reflexiones en torno a la vista preliminar. Veamos.

I. *Introducción:*

Para el año 1924 el entonces Juez Presidente, don Emilio del Toro, describió el siguiente panorama en Puerto Rico:

Existe un clamor justificado en muchas ocasiones contra la dilación en la administración de la justicia en nuestro país, tanto en las causas criminales como en los pleitos civiles. Esta corte se ha visto obligada a decretar el sobreseimiento de muchas acusaciones por no haberse sometido a juicio a los acusados dentro del término de ciento veinte días. *Pueblo* v. *Arrocho*, 33 D.P.R. 657, 672 (1924).

Más de medio siglo después, para el año 1978, el actual Juez Presidente, don José Trías Monge —sobre la tónica de inercia procesal y la petrificación de instituciones— escribía: "[e]l abarrotamiento de los calendarios judiciales en Puerto Rico debe ser motivo de alarma". [1]

Que la justicia en Puerto Rico es lenta, es una verdad inconcusa de ayer y hoy. Que la duración de los procesos ha llegado al extremo de que al cabo de un número irrazonable de meses o transcurridos los años es que se alcanzará una solución, en cuyo momento tal vez no remedie nada, es de conocimiento popular. Que los casos criminales languidecen en los tribunales, es incontrovertible. Que los esfuerzos, laboriosidad y devoción de la dirección de los tribunales, jueces y el personal parajudicial del pasado y presente no han podido evitarlo, es un hecho notorio.

Si bien carecemos de fórmulas mágicas para abordar el problema, estamos convencidos de que la investigación de manera integral es necesaria. El procedimiento penal exige un sistemático análisis sobre una gama de factores, con visión unitaria de los sujetos, objetos y actos que componen su dinámica. Y sobre todo, estos diversos elementos deben ser examinados en funcionamiento, sobre la marcha, anotando y observando cómo se combinan los diversos elementos estructurales y las actividades y comportamiento de los participantes.

Con todo respeto a otras voces autorizadas, en el descargo de nuestra responsabilidad individual e institucional con-

---

[1] Trías Monge, *El Sistema Judicial de Puerto Rico*, San Juan, Ed. U.P.R., 1978, pág. 169.

signamos nuestro criterio de que debe examinarse la posible eliminación de la vista preliminar preceptuada en la Regla 23 de las de Procedimiento Criminal vigentes. Tenemos serias y fundadas reservas —a la luz del análisis, datos y conclusiones— en cuanto a si la misma ha cumplido los objetivos que la inspiraron, o si por el contrario, subsiste como rémora entorpecedora del pronto procedimiento criminal de causas penales. Los estudios empíricos realizados y la experiencia sobre el particular tienden a demostrar que las pocas ventajas obtenidas de la vista preliminar, a corto y largo plazo, han resultado mínimas en comparación con los problemas y costos que acarrean, y los inconvenientes y malestar que genera entre la ciudadanía.

A poco se examinen los fundamentos que se han adelantado para justificar su existencia, se observará que se aceptan o se ignoran unas realidades o hechos que el más ingenuo rechazaría o reconocería. Más aún, en ciertos círculos o sectores de opinión se ha intentado elevar a categoría de dogma constitucional la institución, cuando no la tiene, a la par que la impresión de que su permanencia es imprescindible.

## II. *Directriz constitucional:*

Las reglas procesales que corresponde a este foro aprobar, conforme la directriz contenida en el Art. V, Sec. 6 de nuestra Constitución, deben orientarse sobre el principio de economía procesal, [2] esto es, propiciar un proceso "justo,

---

[2] El ilustre magistrado del Tribunal Supremo de España, don José Trujillo Peña, nos dice:

"Define Jiménez Asenjo la economía procesal, como 'razón o ciencia que procura ahorrar el mayor esfuerzo o gasto posible en la actuación procesal para conseguir el fin propio del proceso', añadiendo que los dos términos comparativos del principio son 'máximo resultado' y 'mínimo gasto'. Guasp citado por el anterior, dice por su parte, que el principio se manifiesta: 'por economía de tiempo, lo que supone el problema de la rapidez del procedimiento; economía de dinero, el problema de la baratura de la justicia; y economía de trabajo, el problema de la sencillez'."

"Por nuestra parte, en la misma línea doctrinal, podemos ofrecer el siguiente concepto: Medio procesal que en aras de la buena justicia y la equidad,

rápido y económico". El descargo de esta delicada función exige que reconozcamos varias premisas. Lo *primero*, que "proceso, por su misma etimología, quiere decir avanzar, adelantar, para que haya un proceso es necesario que no nos detengamos. Un proceso paralizado, detenido, no es proceso". (³) *Segundo*, toda regla procesal se manifiesta en un doble aspecto: en su función de índole procesal y una de pura actividad administrativa. *Tercero*, el concepto regla, en sus diversas acepciones comprende modo de ejecutar una cosa, precepto, principio o máxima en las ciencias o artes; razón que servirá de medida y a que deberán ajustarse las acciones para que resulten rectas.

Así, por naturaleza inherente, toda regla procesal debe basarse en una hipótesis de generalidad. En *cuarto* lugar, y como corolario, una regla formulada sobre una excepción o un número reducido de casos concretos, lo es por fíat, pero no por esencia, desvirtuándose parcialmente su característica. Si el supuesto fáctico en que se sostiene la norma es incorrecto o irreal, el resultado es que la regla no funcionará. De igual modo, si se pauta para lo singular, habremos reglado lo particular, sacrificando aquello que es regular o general. Y *finalmente*, al trasladar esta concepción al ámbito jurídico-administrativo, advertimos, según apuntado, que tales reglas procesales deberán versar sobre situaciones comunes, trámites ordinarios, documentos usuales y planteamientos y soluciones frecuentes.

Para lograr determinar si se ha cumplido o no con la trilogía constitucional que manda que el procedimiento sea "justo, rápido y económico", debemos reflexionar sobre su contenido.

tiende a aligerar la tramitación y enjuiciamiento de los procedimientos judiciales, removiendo los obstáculos de cualquier orden que lo impidan, dando resolución plena a las pretensiones planteadas ante los Órganos jurisdiccionales por las partes en litigio, en el tiempo y ocasión que aquéllas exijan." *El Principio de la Economía Procesal*, 2 Rev. Derecho Procesal Iberoamericana 285 (1970).

(³) Santiago Sentis Melendo, *El Problema de la Lentitud de los Procesos y sus Soluciones*, 3 Rev. Derecho Procesal Iberoamericana 530–531 (1970).

A) *Proceso justo:* El axioma básico es el ideal de "justicia". Si bien el fallo final de un tribunal debe ser justo, este ideal debe impregnar toda la evolución procesal en sus distintas fases. [4] Una cápsula de las características filosóficas que dan contenido al concepto, nos remonta siglos atrás al pensamiento aristotélico donde prevalece la idea central del "justo medio", esto es, nada en exceso, todo en proporción, evitándose los extremos. Con el advenimiento del cristianismo el concepto evoluciona para proclamar dos vertientes: dar al individuo, como figura central, seguridad en el disfrute equitativo de la vida y asegurarle dicho disfrute, tomando en cuenta el bien social. En el compendio histórico del concepto, notamos énfasis en igualdad, libertad y reparación de agravios. Otra nota característica del concepto es el de la "verdad", concebida ésta como la existencia, certeza y realidad de una cosa o un hecho. Nuestra jurisprudencia, a manera de ejemplo limitado, reconoce esos atributos: "La justicia debe ser igual para todos". *El Pueblo* v. *García,* 32 D.P.R. 723, 731 (1924). "Los intereses de la justicia no son exclusivamente, los del pueblo, o los del acusado: *son los de la sociedad toda interesada en que lo justo triunfe sobre lo injusto.* Y no tienen más alta representación que la del juez que dirige el procedimiento, y encauzar los debates, y cuyo interés es el social, no el de las partes del caso." *Pueblo* v. *Arenas,* 39 D.P.R. 16, 18–19 (1929).

B) *Proceso rápido:* Por la incertidumbre y falta de certeza que conlleva toda adjudicación tardía de una

---

[4] Es interesante apuntar que en la formulación de las actuales reglas de procedimiento criminal, hace dos décadas, nos advertían que su propósito era "abolir disposiciones vigentes que se estimaron por los miembros del Comité [redactor] como injustas o inconvenientes, y a incorporar nuevas disposiciones que tienden a hacer desaparecer situaciones de desventaja que prevalecen en el procedimiento criminal vigente y que son de todos ustedes conocidas. Situaciones de desventaja, a veces para el Estado y a veces para el acusado, pero de desventaja al fin, y por esa razón, indeseables, tanto para y por uno como para y por el otro". *Memoria Primera Sesión Plenaria de la Conferencia Judicial de Puerto Rico,* (11, 12 y 13 de diciembre de 1958), pág. 138.

controversia, está aceptado que un sistema lento propicia injusticias. Periódicamente los jueces advertimos la existencia de ciertos escollos o factores que contribuyen a que las causas criminales sean lentas. El examen de éstos no puede ser uno limitado a la perspectiva judicial, sino uno integral que valúe y considere los impactos positivos y negativos que conllevan las normas a toda la estructura e integrantes del sistema de justicia criminal —jueces, abogados, fiscales, testigos, peritos, perjudicados— y, sobre todo, la ciudadanía en general, último receptor y árbitro de la eficiencia en la administración de la justicia. Las reglas existentes tienen que ser analizadas concienzuda y meticulosamente, con datos empíricos completos, como uno de los medios de comenzar a afrontar responsablemente el problema.

No se necesita mucho esfuerzo mental para concluir que, si las reglas vigentes criminales disponen una serie de plazos relativamente breves en los cuales deben realizarse y procesarse determinadas gestiones —que dicho sea de paso, en la práctica no se cumplen— y, no obstante, el proceso es lento, sus causas radican en otras razones, sectores o factores. Los estudios señalan que: (5)

Históricamente los procedimientos judiciales se han caracterizado por ser complicados, costosos y lentos. Los esfuerzos de personas capacitadas y dedicadas en el pasado de superar tales aspectos no han tenido el éxito contemplado. Uno de los factores que contribuye a la lentitud es la suspensión. Se puede afirmar que la congestión de casos produce suspensiones y éstas producen congestión.

Las dilaciones interminables e injustificadas comprometen los derechos básicos individuales y de la ciudadanía en general y mina la confianza y fundamento de un sistema bajo el imperio de la ley. La mayor falla y debilidad que ha experimentado la administración de justicia en Puerto Rico y en otras jurisdicciones es y ha sido las dilaciones prolongadas e indebidas.

---

(5) *Informe Sometido al Consejo sobre la Reforma de la Justicia en Puerto Rico por la Comisión para el Estudio de los Tribunales*, 1974.

C. *Efectos:*

Los efectos de las dilaciones y suspensiones tradicionalmente reconocidas se pueden consignar en las siguientes proposiciones:

1) Afecta la confianza y fe en el sistema, jueces, fiscales, abogados y demás integrantes;

2) Impone gravámenes económicos adicionales sobre los acusados, partes, testigos, y demás ciudadanía;

3) Contribuye a la congestión de casos y afecta adversamente el presupuesto funcional del sistema de justicia del país;

4) Alienta el deterioro de evidencia ante la indisponibilidad (ausencia, desaparición o muerte) de testigos, pérdida de memoria sobre hechos esenciales, etc.;

5) Fomenta un sentido de injusticia debido a que el transcurso de mucho tiempo crea inseguridad e incerteza en la determinación final factual y jurídica de las controversias; y

6) Propicia acuerdos o arreglos injustos.

En una clasificación genérica los factores que intervienen en las dilaciones de los procedimientos y las suspensiones de casos se pueden ubicar del siguiente modo:

a) *Personas*: 1. Jueces; 2. Abogados; 3. Fiscales; 4. Acusados; 5. Partes; 6. Testigos.

b) *Sistemas*: 1. Reglas Procesales; 2. Actitudes y prácticas prevalecientes; 3. Facilidades y recursos existentes; 4. Enfoque jurisprudencial.

Sin embargo, dicho Informe señaló que "[l]a evaluación concreta y empírica del fenómeno de las suspensiones, factores concurrentes, efectos y remedios no ha sido objeto de estudio anterior en Puerto Rico. Excepto para uso interno, y limitado a ciertos datos, las estadísticas oficiales publicadas anualmente en el Informe del Director Administrativo de los Tribunales, no contienen información sobre las suspensiones que ocurren en nuestro sistema y sus causas". *Ibid.*, pág. 258.

A manera de paréntesis, anticipamos que el análisis sobre la vista preliminar preparado por el Secretariado de la Conferencia Judicial constituye un buen intento para proveernos de los elementos de juicio necesarios para descargar nuestra misión. Sin embargo, con todo respeto,

adolece de serias fallas por razón de lo limitado de los datos en que se apoyan sus conclusiones.

C) *Proceso económico*: Si bien esta característica corresponde al aspecto pecuniario, su examen cubre no sólo los costos de la rama judicial, sino de todos los participantes que de ordinario intervienen en el procesamiento del sistema de justicia criminal. Una clasificación sistemática comprende los siguientes aspectos:

(i) *Presupuesto público*: Implica ponderar los gastos operacionales de mantener el personal de todos los componentes principales e incidentales que intervienen regularmente —jueces (Poder Judicial), fiscales (Departamento de Justicia), secretarios, alguaciles, policías y otros—; los desembolsos relacionados con los trámites y documentos ordinarios relativos a la formulación de querella, denuncia, acusación, citación, dietas, órdenes de arresto, libro de radicaciones, mociones; el presupuesto para las facilidades físicas: desde propiedad inmueble y mueble para oficina, salones de sesiones, hasta otros costos importantes, tales como luz, agua, mantenimiento, administración, etc.

(ii) *Al acusado*: Conlleva evaluar los gastos de defensa del caso, que puede ser mediante contratación de abogado en el ejercicio privado de la profesión o la representación gratuita por la Sociedad para Asistencia Legal.

(iii) *A los testigos*: Presupone estudiar los costos sociales en atención a los gastos de transportación, pérdida de ingreso por ausencia del trabajo, no compensables mediante costas.

A tono con este trasfondo conceptual, a la luz del examen de todos estos factores concurrentes, corresponde formular una contestación a las siguientes interrogantes: ¿Cuál es el verdadero costo social —al Estado (Poder Judicial, Fiscales y Policía), al acusado y los testigos— de una vista preliminar? ¿Cuánto es el costo real y social promedio de una suspensión? Y más aún, ¿cuál es el costo espiritual que está pagando el

sistema de justicia criminal por el mantenimiento de la vista preliminar?

III. *Análisis del informe del Secretariado sobre vista preliminar citado por la parte peticionaria:*

El peticionario apoya su posición en una recomendación del Informe del Secretariado de la Conferencia Judicial. Ciertamente, éste constituye un trabajo elaborado y de gran utilidad. Su mayor falla radica en lo moderado y limitado de los datos empíricos. Aun así, su examen parece confirmar la tesis sobre el panorama desalentador en que se encuentra el sistema de justicia criminal en el país y es un buen indicador para inquirir si la vista preliminar debe o no debe eliminarse, debido a que esta institución aparentemente empaña la eficaz administración de la justicia criminal y no propicia un sistema justo, rápido ni económico.

Sobre sus aspectos negativos, basta reproducir las siguientes conclusiones: existe un descontento entre todos los participantes de la vista preliminar en San Juan, debido a los señalamientos excesivos y a las múltiples suspensiones (págs. 37-38); hay un índice altísimo de suspensiones (más de las que se celebran), y como promedio, de una a tres veces (pág. 41); los testigos se cansan de los múltiples señalamientos y desisten de comparecer (pág. 43); las suspensiones merman los recursos humanos de un sinnúmero de funcionarios públicos; la Sociedad para Asistencia Legal carece de recursos económicos suficientes para realizar su labor (pág. 44); y las renuncias causan comparecencias inútiles (pág. 48). Estos extremos corroboran los apuntamientos consignados en el *Informe Sometido al Consejo sobre la Reforma de la Justicia en Puerto Rico por la Comisión para el Estudio de los Tribunales, 1974.* En otras palabras, han transcurrido seis (6) años desde que se hicieron los primeros señalamientos en torno al problema de las suspensiones en las vistas preliminares sin que hasta el presente, administrativamente, se hayan podido poner en práctica las recomendaciones tendentes a minimizarlas.

De otro lado, entre los aspectos positivos tendentes a justificar su existencia, resaltan el costo-beneficio en términos de tiempo y de carácter económico y su función de cedazo y desvío (pág. 89). Examinemos estos méritos.

(i) *Costo-beneficio de tiempo*:

Se le adjudica a esta institución una economía procesal en el tiempo transcurrido en la ventilación y adjudicación del proceso plenario, un plazo de *1.42* meses por caso durante el año 1977–78, y se concluye que los períodos de tiempo desde su radicación hasta su correspondiente resolución son como sigue: casos de naturaleza grave en el Tribunal Superior, 5.88 meses; vista preliminar en el Tribunal de Distrito, 1.18 meses; y *de novo* ante el Tribunal Superior, 2.67 meses.

Con conocimiento íntimo de la lentitud clásica de los procesos, nos preocupó sobremanera la correspondencia entre estas conclusiones estadísticas y la realidad. Las dudas se esclarecieron al percatarnos de que un examen detenido de la metodología seguida para este análisis reflejó que éstas estaban fundamentadas y formuladas sobre el criterio estadístico *de mediana*. La mediana representa el valor del término medio de determinado grupo de datos (casos), luego de haber sido ordenado dicho grupo en forma ascendente o descendente. Este valor divide los datos de tal forma que más del 50% de los datos es mayor o menor que él. Por tanto esta medida describe el centro de los datos. La dificultad de este criterio radica en que puede ser un pobre índice con respecto a los extremos de la agrupación. En el análisis de este beneficio, el uso de la mediana es un método desorientador, pues incluye las renuncias a la vista preliminar y las alegaciones de culpabilidad en ambos niveles del Tribunal de Primera Instancia. A tal efecto, es interesante notar que para el año 1977–78 se "resolvieron" 15,628 casos de vista preliminar, de los cuales 2,519 (16.1%) fueron a través de renuncias, y que de los 12,246 casos graves "resueltos" en igual período en el Tribunal Superior, 4, 831 —equivalente a un 40%— fueron a través de alegaciones de culpabilidad.

Consideramos también carente de validez objetiva el resultado de que el tiempo promedio de una vista preliminar es 1.18 meses. Basta recordar lo consignado en el propio Informe de que la vista "se suspende, . . . como promedio de una a tres veces" y que según el cuestionario de los jueces, "[c]uando se suspende un caso el nuevo señalamiento es para dos o tres meses después" (pág. 36).

El siguiente cuadro ilustra la magnitud del problema de las suspensiones durante el período comprendido entre el 1ro de julio de 1977 y el 30 de junio de 1978.

| Sala | Vistas Señaladas | | Vistas Celebradas | | Vistas Suspendidas | |
|------|--------|------|--------|------|--------|------|
|      | Número | % | Número | % | Número | % |
| Aguadilla | 1300 | 100% | 805 | 61.9% | 495 | 38.1% |
| Aibonito | 571 | 100% | 297 | 52.0% | 274 | 48.0% |
| Arecibo | 1920 | 100% | 864 | 45.0% | 1056 | 55.0% |
| Bayamón | 5215 | 100% | 2404 | 46.1% | 2811 | 53.9% |
| Caguas | 1985 | 100% | 938 | 47.3% | 1047 | 52.7% |
| Guayama | 1164 | 100% | 665 | 57.1% | 499 | 42.9% |
| Humacao | 1526 | 100% | 857 | 56.2% | 669 | 43.8% |
| Mayagüez | 1760 | 100% | 1022 | 58.1% | 738 | 41.9% |
| Ponce | 4014 | 100% | 1557 | 38.8% | 2457 | 61.2% |
| San Juan | 13574 | 100% | 5557 | 40.9% | 8017 | 59.1% |
| Utuado | 602 | 100% | 231 | 38.4% | 371 | 61.6% |
| TOTAL | 33631 | 100% | 15197 | 45.2% | 18434 | 54.8% |

Fuente de información: Informe Semanal de Vistas Preliminares enviado por los Secretarios del Tribunal de Distrito.

De poca confiabilidad también resulta el supuesto tiempo promedio de 2.67 meses de vista preliminar en alzada (*de novo*) debido al alto índice y a la frecuencia de las suspensiones que en dicha etapa se dan.

## SEÑALAMIENTOS Y SUSPENSIONES DE VISTAS PRELIMINARES *DE NOVO*

### AÑOS FISCALES 1965–66 AL 1976–77

| Año | Señaladas | Suspendidas | Resueltas |
|---|---|---|---|
| 1976–77 | 1,681 | 788 (47%) | 893 (53%) |
| 1975–76 | 1,802 | 898 (50%) | 904 (50%) |
| 1974–75 | 1,432 | 692 (48%) | 740 (52%) |
| 1973–74 | 1,153 | 678 (59%) | 475 (41%) |
| 1972–73 | 1,024 | 676 (66%) | 348 (34%) |
| 1971–72 | 542 | 289 (53%) | 253 (47%) |
| 1970–71 | 440 | 228 (52%) | 212 (48%) |
| 1969–70 | 361 | 122 (34%) | 239 (66%) |
| 1968–69 | 462 | 236 (51%) | 226 (49%) |
| 1967–68 | 272 | 138 (51%) | 134 (49%) |
| 1966–67 | 315 | 134 (43%) | 181 (57%) |
| 1965–66 | 269 | 137 (51%) | 132 (49%) |

Fuente de Información: Tablas de los Informes Anuales del Director Administrativo de los Tribunales para los años correspondientes 1965–66 al 1976–77, Oficina de Estadísticas, Tribunal Supremo de Puerto Rico.

De igual modo es dudosa la conclusión de que el tiempo promedio de un caso grave en el Tribunal Superior es de 5.88 meses desde la radicación en la secretaría hasta su resolución. Nuestro escepticismo descansa en un cómputo de las propias estadísticas oficiales acumuladas y publicadas anualmente por la Oficina de la Administración de Tribunales. Según éstas, la siguiente tabla desglosa fiel y exactamente la relación de tiempo transcurrido en los casos pendientes ante el Tribunal Superior desde su radicación:

## DESGLOSE DE RELACION DE TIEMPO TRANSCURRIDO DESDE SU RADICACION, TRIBUNAL SUPERIOR
### AÑOS FISCALES 1956-57 al 1977-78

| Años Fiscales | Total de Casos Pendientes | Menos de 6 meses | | 6 meses a más de 1 año | | Total tardanzas hasta 1 año | | Total 1 año o más | | Desglose de Tardanzas | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | 1 año a 2 años | | 2 años o más | |
| | | Total | % del Total | Total | % del Total | Total | % del Total | Total | % del Total | Total | % del Total | Total | % del Total |
| 1956-57 | 869 | 406 | 46.7 | 141 | 16.2 | 547 | 62.9 | 322 | 37.0 | 130 | 14.9 | 192 | 22.0 |
| 1957-58 | 1262 | 669 | 53.0 | 245 | 19.4 | 914 | 72.4 | 348 | 27.5 | 103 | 8.1 | 245 | 19.4 |
| 1958-59 | 1873 | 915 | 48.8 | 450 | 24.0 | 1365 | 72.8 | 508 | 27.1 | 214 | 11.4 | 294 | 15.7 |
| 1959-60 | 2260 | 1076 | 47.6 | 468 | 20.7 | 1544 | 68.3 | 716 | 31.6 | 331 | 14.6 | 385 | 17.0 |
| 1960-61 | 2949 | 1312 | 44.4 | 628 | 21.3 | 1940 | 65.7 | 1009 | 34.2 | 510 | 17.2 | 499 | 16.9 |
| 1961-62 | 3584 | 1542 | 43.0 | 596 | 16.6 | 2138 | 59.6 | 1446 | 40.3 | 641 | 17.8 | 805 | 22.4 |
| 1962-63 | 4554 | 1797 | 39.4 | 955 | 21.0 | 2752 | 60.4 | 1802 | 39.5 | 797 | 17.5 | 1005 | 22.0 |
| 1963-64 | 4306 | 2049 | 47.6 | 736 | 17.0 | 2785 | 64.6 | 1521 | 35.3 | 667 | 15.4 | 854 | 19.8 |
| 1964-65* | 3250 | 1472 | 45.3 | 485 | 14.9 | 1957 | 60.2 | 1293 | 39.7 | 549 | 16.8 | 744 | 22.8 |
| 1965-66 | 3286 | 1663 | 50.6 | 466 | 14.1 | 2129 | 64.7 | 1157 | 35.2 | 326 | 9.9 | 831 | 25.2 |
| 1966-67 | 2903 | 1608 | 55.4 | 301 | 10.3 | 1909 | 65.7 | 994 | 34.2 | 212 | 7.3 | 782 | 26.9 |
| 1967-68 | 2925 | 1767 | 60.4 | 278 | 9.5 | 2045 | 69.9 | 880 | 30.0 | 206 | 7.0 | 674 | 23.0 |
| 1968-69 | 4186 | 2468 | 59.0 | 676 | 16.1 | 3144 | 75.1 | 1042 | 24.8 | 307 | 7.3 | 735 | 17.5 |
| 1969-70 | 6604 | 3529 | 53.4 | 1471 | 22.3 | 5000 | 75.7 | 1604 | 24.2 | 760 | 11.5 | 844 | 12.7 |
| 1970-71 | 7553 | 3424 | 45.3 | 1672 | 22.1 | 5096 | 67.4 | 2457 | 32.5 | 1380 | 18.2 | 1077 | 14.2 |
| 1971-72 | 7971 | 3494 | 43.8 | 1680 | 21.1 | 5174 | 64.9 | 2797 | 35.0 | 1359 | 17.0 | 1438 | 18.0 |
| 1972-73 | 9307 | 3481 | 37.6 | 1911 | 20.5 | 5409 | 58.1 | 3898 | 41.8 | 1873 | 20.1 | 2025 | 21.7 |
| 1973-74 | 12074 | 4711 | 39.0 | 2233 | 18.5 | 6944 | 57.5 | 5130 | 42.4 | 2159 | 17.8 | 2971 | 24.6 |
| 1974-75 | 14681 | 6420 | 43.7 | 2604 | 17.7 | 9024 | 61.4 | 5657 | 38.5 | 2425 | 16.5 | 3232 | 22.0 |
| 1975-76 | 14869 | 5926 | 39.8 | 2173 | 14.6 | 8099 | 54.4 | 6770 | 45.5 | 2809 | 18.8 | 3961 | 26.6 |
| 1976-77 | 10833 | 3743 | 34.5 | 1532 | 14.1 | 5275 | 48.6 | 5558 | 51.3 | 1529 | 14.1 | 4029 | 37.1 |
| 1977-78 | 8226 | 3342 | 40.6 | 902 | 11.0 | 4244 | 51.6 | 3982 | 48.4 | 753 | 9.1 | 3229 | 39.2 |

Fuente de Información: Tablas de los Informes Anuales del Director Administrativo de los Tribunales para los años correspondientes 1956-57 al 1977-78, Oficina de Estadísticas, Tribunal Supremo de Puerto Rico.

*Comienza a regir la Vista Preliminar en Puerto Rico.

Al observar el desglose de tiempo transcurrido en los casos pendientes ante el Tribunal Superior desde su radicación hasta su disposición, advertimos un estancamiento en los últimos cuatro (4) años en el porcentaje de número de casos resueltos en los primeros seis (6) meses. El año 1977–78 evidenció un aumento que tiende a indicar que recientemente se está agudizando, en lugar de mejorar, el problema de lentitud en el proceso de poner fin a las causas penales a ese nivel. La totalidad del desglose demuestra, en términos generales, que aproximadamente la mitad de los casos se resuelve en el período de un (1) año, y el remanente en un mayor término. Esta tendencia refleja que es altamente cuestionable la conclusión del Informe del Secretariado de que la mediana de resoluciones de casos ante dicho foro es de 5.88 meses. Por el contrario, ilustra y corrobora la impresión generalizada de que al presente subsiste el mal de la dilación a unos niveles intolerables. De continuar este patrón, la crisis que experimenta el sistema de justicia criminal podría tornarse en una sobresaturación.

(ii) *Costo-beneficio económico:*

Otro de los aspectos positivos atribuido a la vista preliminar es que representa un ahorro económico al sistema judicial. Específicamente, para el año 1977–78, la suma global de $432,348.00. También resulta en extremo vulnerable esta aseveración. El análisis de este *cómputo* inexplicablemente limita los datos al sueldo promedio mensual del personal judicial únicamente que interviene en la resolución de los casos, *excluyendo* los siguientes gastos: (a) los que representa la vista preliminar para el Ministerio Fiscal, la Policía, el acusado, abogados privados y abogados de personas indigentes; (b) los que conlleva por la documentación, notificación y demás trámites; y (c) los testigos en lo concerniente a gastos por transportación, dietas, ausencias de sus trabajos y otros, esto es, el costo social.

Como errores mayúsculos, las estadísticas y el examen que se hace sobre costos, no contienen los desembolsos

sustanciales que se irrogan: (a) por cada suspensión al sistema judicial (recordemos que la posposición de casos es uno de los aspectos patológicos del proceso, que en índices elevados consume energía) y (b) no toma en consideración el fenómeno de las múltiples suspensiones y los desembolsos que las mismas representan, no sólo al sistema judicial, sino a los demás componentes y protagonistas que intervienen regularmente en la misma. Esta falla principal anula toda conclusión referente a costo-beneficio económico.

A manera de ilustración, el Informe consigna que "la vista preliminar se suspende, pues, como promedio de una a tres veces". En estas circunstancias, fácil es advertir el impacto económico devastador, si consideramos como costo *mínimo* para el Estado, a manera de ejemplo, que cada suspensión cuesta la suma de $10.00 para el poder judicial, la fiscalía, la Policía y peritos. Al multiplicar esta cantidad por 18,434 vistas señaladas y suspendidas, advertimos que ello representaría un aumento operacional de $184,340.00 en el caso de una suspensión; $368,680.00 en casos de dos suspensiones y $553,020.00 en casos de tres suspensiones. Es de rigor acentuar que esta apreciación económica no toma en cuenta el costo social que la simple comparecencia conlleva para todo testigo y acusado.

Repetimos, no se puede evaluar la utilidad de un mecanismo como la vista preliminar mediante un análisis aislado de costo. Es necesario incluir, para lograr una visión panorámica, los gastos que representa a los otros componentes del sistema: policías, fiscales, asistencia legal y a la ciudadanía en general.

(iii) *Cedazo y desvío de casos*:

Concentramos nuestra atención en la hipótesis de que la vista preliminar representa un cedazo que evita el procesamiento indebido de un individuo a la par que beneficia al sistema judicial descargando un número de casos fuera del recinto del Tribunal Superior.

Ciertamente el Informe que nos ocupa demuestra que la

vista preliminar constituye limitadamente un cedazo que evita que se radiquen ante el Tribunal Superior un sinnúmero de casos en virtud de: (a) exoneración por no mediar causa probable o archivo y (b) traslado al Tribunal de Distrito o al Tribunal Superior, Asuntos de Menores.

La utilidad de la vista preliminar en cuanto a estos extremos es más aparente que real, pues, además de que los aspectos negativos sobre la lentitud y costo sobrepasan su beneficio y no justifican el automatismo procesal, cabe oponer varios señalamientos.

Primero, en cuanto a su principal razón de ser —evitar el procesamiento indebido de un ciudadano— el número de casos en que como consecuencia de la vista preliminar hay exoneración es mínimo y reducido al contrastarse con los sometidos a juicio. La próxima tabla lo ilustra:

| Años | Total Resueltos | Se Sometió Persona a Juicio | | Exonerados | |
|------|------|-----------|-------------------------------|----------|-----------------------------|
| | | Cantidad | % del Total de Vistas Resueltas | Cantidad | % del Total de Vistas Resueltas |
| 1965–66 | 6877 | 5629 | 81.9 | 676 | 10.17 |
| 1966–67 | 7424 | 5816 | 78.3 | 742 | 10.01 |
| 1967–68 | 7819 | 6333 | 81.0 | 781 | 10.01 |
| 1968–69 | 8908 | 7325 | 82.2 | 740 | 12.04 |
| 1969–70 | 11446 | 9193 | 80.3 | 921 | 12.43 |
| 1970–71 | 11874 | 9384 | 79.0 | 1078 | 11.01 |
| 1971–72 | 12041 | 9225 | 76.6 | 1415 | 8.51 |
| 1972–73 | 12747 | 9356 | 73.4 | 1715 | 7.43 |
| 1973–74 | 15644 | 11039 | 70.6 | 1875 | 8.34 |
| 1974–75 | 20808 | 14880 | 71.5 | 2891 | 7.20 |
| 1975–76 | 20554 | 14504 | 70.6 | 2919 | 7.04 |
| 1976–77 | 17169 | 11887 | 69.2 | 2887 | 5.95 |
| 1977–78 | 15628 | 10192 | 65.2 | 2155 | 7.25 |

Fuente de Información: Informes Anuales de la Oficina de la Administración de los Tribunales.

De este dato podemos concluir que en la presente década el porcentaje de exoneraciones ha ido reduciéndose, lo cual es indicativo de un alto por ciento de corrección en la apre-

ciación de existencia de causa probable para el arresto bajo la Regla 6 (a) de Procedimiento Criminal vigente.

Y segundo, respecto a los dictámenes que no constituyen en sí una exoneración, tales como traslados al Tribunal Superior, Asuntos de Menores, o al Tribunal de Distrito, o archivos por razón de locura u otros motivos, advertimos lo siguiente: (a) el desviar casos al Tribunal Superior, Asuntos de Menores, se lograría —con igual prontitud ¡o tardanza!— mediante la única gestión de una simple moción que acredite fehacientemente la minoridad de edad del acusado al momento de cometer el delito imputado; (b) el traslado de estos casos al Tribunal Superior, Asuntos de Menores, realmente no descarga ni libera los recursos del Tribunal Superior, sino que los transfiere a otra sección; (c) no constituye dictamen que ponga fin a la controversia judicial, la remisión de casos al Tribunal de Distrito; (d) los remitidos al Tribunal de Distrito constituyen un número insustancial —343, equivalente a 4.5%, nos señala el Informe (pág. 55)— que recargan este último foro por segunda vez; y (e) es altamente cuestionable que dictámenes de archivo bajo la Regla 247, desestimaciones bajo la Regla 64, o fallos análogos, puedan considerarse como logros justificativos de la vista preliminar.

Los propulsores y el Informe favorecen que se perpetúen los testimonios mediante récord y se extienda al ámbito de acción del juez interventor, permitiendo al imputado invocar la regla de exclusión de evidencia ilegalmente obtenida y otras defensas. Pronosticamos que de ser así configurada, en lugar de una "vista preliminar" estaremos creando un "juicio previo" y la experiencia indica que el costo de la defensa aumentaría nuevamente de manera sustancial. Si examinamos este ángulo desde el punto de vista de sensibilidad de un ciudadano que es denunciado, la lógica nos mueve a concluir que es más costoso, embarazoso, y de mayor impacto negativo exponerlo a dos vistas: la preliminar sobre determinación de causa y la del juicio plenario. Más aún, se corre el riesgo —de mediar una exoneración— de una vista preliminar *de*

*novo*. Nos preguntamos, ¿no sería más justo, rápido y económico para todos la creación de un trámite que establezca que de la determinación de causa probable inicial —de estimar el imputado que es inocente, menor de edad, que no hay evidencia suficiente o que posee otras defensas— se le permita directamente solicitar y obtener la ventilación pronta del juicio en su fondo? Esta adjudicación, contrario al juicio previo de la vista preliminar, de serle favorable, sería final por no ser apelable.

En atención a los sujetos participantes y a las facilidades, la siguiente composición ilustra visualmente el contraste entre la vista preliminar actual, recomendada por el Secretariado, y el juicio en su fondo:

CUADRO COMPARATIVO ENTRE LA VISTA PRELIMINAR
ACTUALMENTE PROPUESTA Y EL JUICIO EN SU FONDO
(ASPECTOS DEL PERSONAL PARTICIPANTE Y LAS
FACILIDADES MÍNIMAS)

| VISTA PRELIMINAR ACTUAL Y SEGÚN RECOMENDACIONES | JUICIO EN SU FONDO ANTE EL TRIBUNAL SUPERIOR |
|---|---|
| *Personal Participante:* | *Personal Participante:* |
| Un Juez de Distrito | Un Juez Superior o un Juez de Distrito designado por el Juez Presidente |
| Un abogado | Un abogado |
| Un fiscal | Un fiscal |
| Uno o más testigos del pueblo y/o de la defensa | Uno o más testigos del pueblo y/o de la defensa |
| Un sub-alguacil | Un sub-alguacil |
| Un sub-secretario | Un sub-secretario |
| Una estenotipista u operador de grabadora | Una estenotipista u operador de grabadora |
| | Doce (12) Jurados a opción del acusado |
| *Aspecto Físico:* | *Aspecto Físico:* |
| Sala o despacho del juez con accesorios tales como muebles, etc. | Sala del juez con accesorios tales como muebles, etc., y facilidades para el jurado |

Al examinar esta relación comparativa se destaca que la diferencia básica entre los participantes en una vista preliminar —según integrada al presente y la propuesta— y una causa en su fondo en el Tribunal Superior es la categoría del magistrado y el derecho renunciable a juicio por jurado que todo acusado de delito grave tiene. Sobre estos extremos es menester recordar que los Jueces de Distrito con cierta frecuencia son designados para actuar en el Tribunal Superior, y que las propias estadísticas acumuladas por la Oficina de Administración de Tribunales demuestran que la mayoría de las causas son dilucidadas ante tribunal de derecho por renunciarse al jurado. En el último año, del total de 2,486 casos graves, 338 (14%) fueron ante jurado, y el remanente, 2,148 (86%) por tribunal de derecho.

La dificultad del argumento de los promoventes de la vista preliminar es que, en el fondo, la hipótesis implícita que late está predicada únicamente en los beneficios económicos que de ella se obtienen. Este logro económico, a su vez, presupone la existencia de una diferencia basada en una menor o mayor escala de sueldos, fundada ésta en la desigual experiencia de los abogados y representantes del Ministerio Fiscal, *vis-à-vis* sus concordantes ante el Tribunal Superior.

Hemos de rechazar tal proposición por entender que ello, en lugar de justificar su existencia, plantearía serias interrogantes sobre la calidad, excelencia y corrección de los fallos del sistema de justicia penal en dicha etapa. No estamos conformes en dispensar una justicia "barata" para beneficio exclusivo del sistema judicial, sacrificando otros intereses, tales como el derecho a juicio rápido del acusado, una defensa económica y el deseo de la ciudadanía de que se diluciden prontamente los casos criminales.

Aun prescindiendo de la diferencia real en los sueldos que devenga el personal que interviene en el Tribunal de Distrito con relación a aquel del Tribunal Superior, cabe inquirir si en virtud de la concordancia de los participantes, según el

cuadro antes demostrado, la vista preliminar tiene hoy en día el siguiente significado: aunque con ciertas restricciones, es un juicio en su fondo ante el tribunal de derecho a nivel de Tribunal de Distrito. Siendo ello así, ¿se justifica su existencia cuando se erige como impedimento para el procesamiento rápido de las causas criminales? Recuérdese que estas vistas se suspenden de una (1) a tres (3) ocasiones. El Informe del Secretariado tiende a sostener lo que la experiencia dicta, a saber, que los testigos y los ciudadanos se cansan de los múltiples señalamientos y desisten de comparecer (pág. 43). Comienza entonces otro círculo vicioso en el fenómeno de las suspensiones, a saber, tales incomparecencias causan suspensiones y éstas, a su vez, incomparecencias.

IV. *Perspectiva y Conclusiones:*

Al hacer inventario somos de opinión que los logros de la vista preliminar, comparados con los problemas que genera, son insignificantes y mínimos. Todo tiende a indicar que más bien constituye un obstáculo irremediable para que hoy en día los procesos penales se ventilen con rapidez. No sólo conlleva un derroche de dinero para todos los componentes del sistema de justicia, sino que es un gravamen a la ciudadanía, que fomenta un estado de injusticia e inseguridad debido a la falta de certeza sobre en qué momento comenzará y terminará la determinación final fáctica y jurídica de la controversia.

A riesgo de que nos tachen de pesimistas, con todo respeto, creemos que el mal de las suspensiones continuará minando el sistema de justicia criminal. Toda suspensión representa una interrupción y alteración del procedimiento, y en las proporciones que se dan en la vista preliminar son una verdadera crisis o anormalidad en el desenvolvimiento justo, rápido y económico. La situación que prevalece es que la regla se topa con que el actor del proceso tiene distintos y contrarios objetivos. Los optimistas que creen que pueden lidiar con las suspensiones y dilaciones en el área penal —incluso los proponentes de la vista preliminar— olvidan, tal y como

se ha reconocido en distintos estudios llevados a cabo en distintas jurisdicciones, (⁶) que, por regla general, a los acusados no les interesa que sus casos se ventilen rápidamente. Por el contrario, la suspensión tiende a favorecerlos, pues propicia el deterioro de la evidencia y su disponibilidad por razón de falta de interés, ausencia, desaparición, muerte o pérdida de la memoria de los testigos sobre hechos esenciales. Esta actitud del protagonista principal se entiende. Es un hecho que no necesita comprobación y debe aceptarse como parte de la dinámica del proceso y la conducta humana. En este sentido existe un profundo abismo entre esta realidad y el ideal constitucional de "juicio rápido" para el acusado. La situación no es exclusiva del presente. Hace más de un cuarto de siglo, durante el debate de nuestra Ley Fundamental, se señalaba:

[T]odas las leyes, dicen que el acusado tendrá derecho a un juicio rápido. ¡Mentira! El acusado tiene el derecho a un juicio rápido, *pero no quiere nunca, nunca quiere un juicio rápido.* Es el juez, es la sociedad, es el fiscal, [el] que tiene que luchar contra el acusado para que tenga un juicio rápido. *El acusado no quiere nunca, nunca quiere un juicio rápido. Diario de Sesiones de la Convención Constituyente,* (ed. 1961) Tomo 2, pág. 767. (Énfasis nuestro.)

De igual modo resulta insuperable el problema de la renuncia a la vista preliminar. Nada evita que sea suspendida en varias ocasiones y después se renuncie a la misma. La recomendación del Informe con miras a evitar las comparecencias inútiles de fiscales y testigos, que exigen que la renuncia sea hecha por lo menos con un día de anticipación a su celebración, es irreal e ignora que por la brevedad del período resultará imposible notificar efectivamente a los testigos de que no es necesaria su asistencia en dicha ocasión. Además, ¿qué consecuencia o sanción tendrá el que el acusado haga

---

(⁶) Katz, Litwin & Bamberger, *Justice is the Crime: Pretrial Delay in Felony Cases,* (1972) págs. 62–81; *Pretrial Delay A Review & Bibliography,* Nat. Center for State Courts (1978).

caso omiso a dicha regla y pretenda renunciarla el día de la vista? ¿Lo negará el tribunal y procederá a su celebración? ¿Con qué objeto?

Hemos reflexionado intensamente sobre las alternativas viables para el sistema de justicia criminal del país. Al meditar sobre la recomendación del *Informe Sometido al Consejo sobre la Reforma de la Justicia en Puerto Rico por la Comisión para el Estudio de los Tribunales*, en el sentido de que la vista preliminar no sea compulsoria, sino que se celebre a opción del acusado, creemos que ello no ayudaría a solucionar los problemas expuestos y al estancamiento y atraso de casos. En estricta lógica, si la conducta y actitudes de los acusados o sus abogados en el pasado son indicadores de alguna tendencia, cabe esperarse que el sistema acabaría operando a la inversa de las renuncias en el presente, esto es, una proporción alta de acusados que piden vista preliminar con los consabidos problemas. La mayoría solicitaría vista preliminar para ganar tiempo y luego renunciar a ella. No habría sanciones para tal proceder, pues resultaría difícil separar las gestiones *bona fide* de aquellas no legítimas formuladas con otras motivaciones. Además, causaría cierta inestabilidad en el método de citación automática de testigos utilizados al presente para la primera comparecencia.

Para salvar actitudes de profundas raíces y superar problemas complejos, posiblemente debamos adoptar una radical, pero sencilla solución: su eliminación. El momento ha llegado. Durante el año 1978 venció el término del último Juez de Paz. Nada impide, si no se ha hecho, que se complete su sustitución total por jueces municipales que son abogados, lo cual es de esperarse que razonablemente redunde en unas apreciaciones y determinaciones más certeras en cuanto a la existencia o no de causa probable para el arresto.

Bajo esta alternativa de la etapa de determinación de causa probable por un juez, el fiscal inmediatamente presentaría acusación en la Secretaría del Tribunal Superior

correspondiente y el caso sería señalado para el acto de la lectura de la acusación, en cuya ocasión el acusado y su abogado —de registrarse alegación de no culpabilidad— tendrían derecho a recibir las declaraciones juradas de los testigos del Pueblo consignados al dorso del pliego acusatorio. Para salvaguardar el derecho a aquellos acusados deseosos de un juicio rápido —por estimar que la prueba de cargo es insuficiente, la evidencia fue ilegalmente obtenida, la confesión es involuntaria u otras defensas análogas— se crearía un mecanismo para ventilar prontamente, a solicitud de éstos y con carácter preferencial, la vista en sus méritos. Los casos menos graves dimanantes de la misma transacción que los graves irían paralelos; ni uno ni otro impedirían su procesamiento.

La siguiente gráfica ilustra la idea y el ahorro estimado que en tiempo podríamos obtener al eliminarse la vista preliminar, y, por ende, el trámite de una a tres suspensiones.

## GRÁFICA DE LA DINÁMICA PROCESAL EXISTENTE Y RECOMENDADA, ELIMINÁNDOSE LA VISTA PRELIMINAR

**AHORRO ESTIMADO:**

De dos (2) a cuatro (4) meses según el número de suspensiones y el espacio de tiempo entre cada señalamiento.

Somos conscientes de y anticipamos la crítica que entre ciertos sectores de nuestra profesión esta posición podrá generar. En particular, para algunos abogados que se desempeñan en el campo del derecho penal, la vista preliminar tiene un significado estratégico que trasciende las ventajas obvias del aspecto económico y de controlar indirectamente el momento en que finalmente se ventilará el caso en su fondo. Forma parte de una permisible técnica de defensa el usufructuarla, no sólo con el propósito de obtener las declaraciones juradas de los testigos de cargo prestadas previamente ante el fiscal, sino para tomar constancia y conocer la forma de comportarse y declarar de dichos testigos; amén de obtener declaraciones adicionales sobre las cuales fundamentar futuras impugnaciones por las probables contradicciones, que en la mayoría de los casos son inconsecuentes y normales por ser atribuibles a la limitación humana de no poder repetir —en diversas ocasiones, *ad verbatim*— determinado testimonio, sin incurrir en ciertas contradicciones, omisiones u adiciones.

Posiblemente este reparo y otros son el precio que se pague por comenzar a abrir brecha en la administración de justicia criminal y visualizar el proceso penal como un fenómeno dinámico e integral en el que chocan los intereses de sus protagonistas. No podemos seguir observándolo microscópicamente como si fuera un solo acto o un proceso intocable. Como tampoco citando frases bellas en abstracto, carentes de pragmatismo en el orden procesal. La insatisfacción y reclamo del pasado subsisten en el presente. El sistema y la vista preliminar padecen la tara procesal de las suspensiones. Se impone poda en el procedimiento si se quiere simplificar los trámites, aunque sin incidir en la indefensión de los acusados. Es altamente cuestionable sostener que la vista preliminar propicia el procesamiento "justo, rápido y económico" de los casos criminales. Aparentemente el experimento ha fracasado, e insistir en él es un vano consumo de energía pro-

cesal. Deben completarse los estudios de manera integral, examinando todos los aspectos y factores evaluados. Si éstos confirman nuestras impresiones, entonces la alternativa viable y pragmática que debemos recomendar a la Asamblea Legislativa es su eliminación, creándole a los acusados las garantías del descubrimiento de prueba y el derecho de éstos a solicitar el señalamiento y ventilación de vista en su fondo preferentemente. Carentes al presente de todos los elementos mencionados, posponemos nuestra particular decisión final al respecto.